# EXHIBIT C

**In the Matter Of:**

ALONZO D. JONES. SR. vs

COUNTY OF YORK, et al.

*ALONZO D. JONES*

August 14, 2019



Geiger Loria Fillus McLucas Reporting LLC
2550 Kingston Road, Suite 217
York, PA 17402
York 717.845.6418
Harrisburg 717-541-1508
800.233.9327
Scheduling@glfmllc.com

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

ALONZO D. JONES, SR.,            :
        PLAINTIFF         :   NO. 1:19-CV-00229-JEJ
                   :
        VS               :   JURY TRIAL DEMANDED
                   :
COUNTY OF YORK, DISTRICT         :
ATTORNEY DAVID SUNDAY,           :
CHIEF MARK L. BENTZEL, AND :
OFFICER PATRICK GARTRELL,        :
    JOINT AND SEVERABLE :
        DEFENDANTS        :

DEPOSITION OF:     ALONZO D. JONES, SR.

TAKEN BY:          DEFENDANTS COUNTY OF YORK AND
                   DISTRICT ATTORNEY DAVID SUNDAY

BEFORE:            TRACY L. LLOYD, RPR
                   NOTARY PUBLIC

DATE:              AUGUST 14, 2019, 10:30 A.M.

PLACE:             YORK COUNTY BAR ASSOCIATION
                   137 EAST MARKET STREET
                   YORK, PENNSYLVANIA

**Alonzo D. Jones**
**August 14, 2019**

**2**

```
 1   APPEARANCES:
 2       THE LAW OFFICE OF SANDRA THOMPSON
         BY:   SANDRA I. THOMPSON, ESQUIRE
 3             P.O. BOX 2361
               351 PRINCESS STREET
 4             YORK, PENNSYLVANIA  17405
               (717) 577-4436
 5
               FOR - PLAINTIFF
 6
         SUMMERS NAGY LAW OFFICES
 7       BY:   SEAN E. SUMMERS, ESQUIRE
               35 SOUTH DUKE STREET
 8             YORK, PENNSYLVANIA  17401
               (717) 812-8101
 9
               FOR - DEFENDANTS COUNTY OF YORK AND DISTRICT
10                   ATTORNEY DAVID SUNDAY
11       MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
         BY:   CHRISTOPHER P. BOYLE, SR., ESQUIRE
12             620 FREEDOM BUSINESS CENTER
               SUITE 300
13             KING OF PRUSSIA, PENNSYLVANIA  19406
               (610) 354-8476
14
               FOR - DEFENDANTS MARK L. BENTZEL AND
15                   PATRICK GARTRELL
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1                 TABLE OF CONTENTS
 2               W I T N E S S
 3   ALONZO JONES                      EXAMINATION
 4     BY MR. SUMMERS                        4
 5     BY MR. BOYLE                         61
 6     BY MS. THOMPSON                      --
 7   (Transcript and errata sheet sent to Ms. Thompson for
        the witness to read and sign.)
 8
 9
10               E X H I B I T S
11   JONES DEPOSITION EXHIBIT NUMBERS        PAGE
12   Exhibit 1 - Complaint                    17
13   Exhibit 2 - Paperwork                   112
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

1  STIPULATION

2  It is hereby stipulated by and between

3  counsel for the respective parties that sealing,

4  certification and filing are waived; and that all

5  objections except as to the form of the question are

6  reserved until the time of trial.

7

8  ALONZO D. JONES, SR., called as a

9  witness, being sworn, testified as follows:

10

11  EXAMINATION

12

13  BY MR. SUMMERS:

14  Q   Good morning, Mr. Jones. We're here again

15  for your deposition because we had to cut the last

16  one short. We were here before on July 29th, 2019.

17  Do you need me to go over the instructions

18  that I gave you at the beginning of the last

19  deposition? Do you need me to tell you those again?

20  A   You could, though.

21  Q   Okay. So the court reporter is typing up

22  everything you and I say, so do your best not to talk

23  over me, and I'll do the same for you because she

24  only has one set of hands and can't type up both of

25  us at the same time.

**5**

1  All your responses need to be oral meaning,

2  for example, yes or no rather than nod of the head

3  because there's no video. It's just a typed

4  transcript. Do you understand that?

5  A   Yes.

6  Q   There's water here. A restroom right

7  outside. If you need a break for anything like that,

8  please let us know. If you need to talk to your

9  attorney, just let us know. I just ask that you

10  answer the question that's pending at that time. Do

11  you understand that?

12  A   Yes.

13  Q   If I'm not speaking loud enough, please ask

14  me to speak up. If you don't understand my question,

15  please ask me to rephrase it or just tell me you

16  don't understand it, and I'll do my best to

17  communicate the question. Do you understand that?

18  A   Yes.

19  Q   Do you have any questions before we begin?

20  A   No, sir.

21  Q   Okay. I don't want to go over everything we

22  went over during the last deposition, but do you

23  still reside at the same place that you did on July

24  29th, 2019?

25  A   Say that again.

**Alonzo D. Jones**
**August 14, 2019**

---

**6**

1    Q    Have you changed your -- where you live
2  since we were here last?
3    A    Oh, no, sir.
4    Q    Have you -- if I recall, you were not
5  working at the time. Are you still unemployed?
6    A    Yes, sir.
7    Q    Okay. Do you still live with your
8  girlfriend?
9    A    No, sir.
10    Q    Okay. Remind me, did you live with your
11  girlfriend at the last deposition?
12    A    Say that again. The last deposition?
13    Q    On July 29th, 2019, the date we were here
14  the last time.
15    A    Yes.
16    Q    Strike that. Who do you live with?
17    A    I live at my dad's house, 1026.
18    Q    By yourself?
19    A    No. My sister lives there with me.
20    Q    Okay. All right. Just as a reminder and
21  you'll -- just so you understand where a lot of my
22  questions are coming from, I represent the County of
23  York and District Attorney David Sunday. All right.
24        Do you understand that you filed a lawsuit
25  against them; correct?

---

**7**

1    A    Yes.
2    Q    Okay. Do you understand you filed a federal
3  lawsuit meaning in federal court?
4    A    Yes.
5    Q    And just in general do you understand that
6  you have alleged that they are racist?
7    A    Say that again.
8    Q    In general do you understand that you have
9  alleged that District Attorney David Sunday is
10  racist?
11    A    That I have alleged that he is racist?
12    Q    Yes.
13        MS. THOMPSON: Object to the form
14  question.
15    A    I don't understand.
16  BY MR. SUMMERS:
17    Q    Let's look at the complaint. Before we get
18  into the complaint, would you agree that alleging
19  someone is racist is a very serious allegation?
20        MS. THOMPSON: I object to the form of
21  the question.
22  BY MR. SUMMERS:
23    Q    You can answer.
24    A    I don't understand what you mean.
25    Q    Would you agree that alleging someone is a

---

**8**

1  racist is a very serious allegation?
2        MS. THOMPSON: Objection.
3    A    I just don't understand what you mean.
4  That's all.
5  BY MR. SUMMERS:
6    Q    Would you agree if you, for example, alleged
7  someone was a racist, that would be a very serious
8  allegation, wouldn't it?
9        MS. THOMPSON: Object to the form of
10  the question.
11    A    I still don't understand what you're trying
12  to get at. I don't understand what you mean.
13        (Jones Deposition Exhibit 1 was marked
14  for identification.)
15  BY MR. SUMMERS:
16    Q    Let's look at some of the language in your
17  complaint. First of all, have you seen that document
18  marked as Exhibit Number 1 before?
19    A    Yes.
20    Q    Okay. Let's look at Paragraph 8, please.
21  That refers to what's called Defendant David Sunday.
22  Do you see that?
23    A    Yes.
24    Q    I believe we discussed before that you don't
25  know who David Sunday is, do you?

---

**9**

1    A    No, I do not.
2    Q    And it references that he's a Caucasian
3  male. You don't know that one way or the other, do
4  you?
5    A    No.
6    Q    All right. Further on in that same
7  Paragraph 8 it says as such, District Attorney Sunday
8  manages, directs, controls, creates, implements
9  policies, supervision, training, and discipline for
10  its officers and employees including NYCRPD and the
11  York County Drug Task Force which is a special
12  prosecution unit of the York District Attorney's
13  Office, and it goes on to give its address. Did you
14  follow along with me?
15    A    Yes.
16    Q    Would you agree that you personally do not
17  know what District Attorney David Sunday manages?
18        MS. THOMPSON: Objection to the form
19  of the question.
20  BY MR. SUMMERS:
21    Q    You can answer.
22    A    I don't know what you mean by that.
23    Q    What does District Attorney's David Sunday
24  manage?
25    A    I don't know.

---

**Alonzo D. Jones**
**August 14, 2019**

10

1  Q   What does he direct?
2  A   It says controls, creates, and implements
3  policies, supervision, training.
4  Q   We're going to get into all those in a
5  second, but right now I'm just focusing on the word
6  that you put in your complaint saying directs. What
7  does he direct?
8      MS. THOMPSON: Objection to the form
9  of the question.
10 BY MR. SUMMERS:
11 Q   You can answer.
12 A   I don't understand. You said direct. I
13 don't understand what you mean by that.
14 Q   Sir, it's your allegations. I'm just asking
15 you to elaborate.
16 A   What does he direct?
17 Q   Yes.
18 A   I don't know what he directs.
19 Q   What does he control?
20     MS. THOMPSON: And I'm just also going
21 to object that the question is only designed for
22 embarrassment of the Plaintiff. Counsel knows that
23 these complaints are written up by legalese through
24 the attorneys.
25     So for counsel to focus on a term and

11

1  the meaning of a word like direct is only for the
2  purpose of harassment and embarrassment of the
3  Plaintiff, of his education and ability to
4  understand words written by his attorney.
5      MR. SUMMERS: To be clear, that's not
6  a basis for an objection, and it never crossed my
7  mind that he would not understand what the word
8  directs or controls means, so.
9  BY MR. SUMMERS:
10 Q   What does District Attorney David Sunday
11 control?
12 A   I don't know, sir.
13 Q   Do you know what he creates?
14 A   No, sir.
15 Q   Do you know what policies he implements?
16 A   No, sir.
17 Q   Do you know who he supervises?
18 A   No, sir.
19 Q   Do you know who he trains?
20 A   I don't know who he trains, but from reading
21 stuff what you have here, it says officers and
22 employees.
23 Q   To be clear, I don't have that there. You
24 have that there.
25 A   Oh. Officers and employees. It says that.

12

1  Q   If you believe he trains officers, what
2  officers?
3  A   I don't know, sir. I wouldn't be able to
4  tell you that.
5  Q   Do you know what employees?
6  A   No, sir.
7  Q   I believe if it doesn't say, NYCRPD refers
8  to Northern Regional Police Department.
9      MS. THOMPSON: I'm going to object to
10 the form of the question. If you look at Paragraph
11 7, it does say.
12     MR. SUMMERS: I can ask the question,
13 but I didn't think there was a dispute. I was just
14 trying to make it easier on him.
15 BY MR. SUMMERS:
16 Q   Sir, who is NYCRPD?
17 A   I don't know, sir. I'd be lying if I told
18 you. I don't know.
19     MS. THOMPSON: Same objection that
20 this line of questioning is just an effort. It's not
21 probative. It's just for embarrassment and
22 harassment.
23     MR. SUMMERS: I'm just asking him
24 questions on the allegations in his complaint.
25 BY MR. SUMMERS:

13

1  Q   Sir, can you flip to Paragraph 16 of your
2  complaint. Just read it to yourself and let me know
3  when you're done. Did you get a chance to read that?
4  A   Yes, sir.
5  Q   And you understand you are the Plaintiff?
6  A   Yes.
7  Q   Is that statement, in fact, true?
8  A   Yes.
9  Q   Okay. Can you flip to Paragraph 22, please?
10 Tell me in your own words what happened on February
11 8th, 2017.
12 A   Well, I was arrested.
13 Q   Okay. Anything else?
14 A   I was taken to -- I guess it's like a
15 station down here on Philadelphia Street.
16 Q   A holding cell or something like that?
17 A   It wasn't a holding cell. It was like in a
18 basement. Like you went downstairs, and they held me
19 there.
20 Q   So they took you to --
21 A   On that day.
22 Q   They took you to the police station?
23 A   Basically.
24 Q   So they arrested you and took you to the
25 police station?

**Alonzo D. Jones**
**August 14, 2019**

14

1      MS. THOMPSON:  Objection to the form
2  of the question.
3  BY MR. SUMMERS:
4      Q    What else did they do?
5      A    Asked questions.
6      Q    Okay.
7      A    I don't know.
8      Q    So they arrested you and took you to the
9  police station and asked you questions.  What else?
10      MS. THOMPSON:  Objection to the form
11  of the question.
12      A    Basically just asked me questions about what
13  they thought was going on that day.
14  BY MR. SUMMERS:
15      Q    Okay.  What did District Attorney David
16  Sunday have to do with arresting you, if you know?
17      A    I don't know who he is, so I couldn't
18  explain that to you.
19      Q    Was he present at the police station on or
20  around February 8th, 2017?
21      A    I'm not sure.
22      Q    Did he participate in the questioning of you
23  on or about February 8th, 2017?
24      A    I'm not sure either.
25      Q    So can you read the entire paragraph to

15

1  yourself, but part of it says Officer Gartrell filed
2  a written complaint.  If you need to read the whole
3  thing, go ahead, but my question is simply what role,
4  if any, did District Attorney David Sunday have to do
5  with filing a written complaint?
6      A    Say that again for me.  I'm sorry.
7      Q    Sure.  If you look at the -- it's actually
8  the first sentence, but the part that I'm focusing on
9  it says Officer Gartrell filed a written complaint.
10  Do you see that?
11      A    Okay.  Right here.  I see it.
12      Q    And simply I just want to know what role
13  District Attorney David Sunday played in filing the
14  complaint, if anything?
15      A    I don't know, sir.
16      Q    Flip to Paragraph 23, please.  Can you just
17  read that to yourself.
18      A    Yes, 23.  I see it.
19      Q    Did you read that?
20      A    Yes.
21      Q    Is that true?
22      A    Yes.
23      Q    Okay.  Can you look at Paragraph 24, please?
24      A    Say that again, though.
25      Q    Read Paragraph 24 to yourself.

16

1      A    It says they accused first African --
2      Q    Right now all I want you to do is read it to
3  yourself and let me know when you're done reading.
4      A    I read 24.
5      Q    Now, and please don't take offense to this,
6  but your attorney suggested that I was asking
7  questions maybe that you didn't understand.  Can you
8  read?
9      A    I can read pretty well.
10      Q    Okay.  If at any point in time I'm asking
11  you to read something and either you can't read it or
12  you don't understand it, will you please tell me?
13      A    Yes.  I'll do that.
14      Q    Did you read Paragraph 24?
15      A    Yes.
16      Q    Okay.  Now, it refers to three individuals
17  in the York County Drug Task there, so it says
18  Defendant District Attorney, which is who I
19  represent, District Attorney David Sunday, Chief
20  Bentzel, Officer Gartrell, and the Drug Task Force.
21  Do you see what I'm referring to there?
22      A    I see what you're speaking on.
23      Q    Now, again, I'm focusing on District
24  Attorney David Sunday.  What did District Attorney
25  Sunday fail to fully investigate?

17

1      A    I don't understand what you're talking
2  about, sir.
3      Q    If you look at the paragraph -- I'll read
4  it, and I'll stop where I'm asking the question.  It
5  says Defendants District Attorney, Chief Bentzel,
6  Officer Gartrell, and YCDTF failed to fully
7  investigate.
8      And my question is really what did David
9  Sunday fail to fully investigate, if anything?
10      A    I don't know, sir.  I won't be able to tell
11  you.
12      Q    Then it goes on to say or other viable
13  suspects.  What other suspects are you referring to
14  there, if you know?
15      A    I don't know, sir.
16      Q    Then it goes on to say and instead accused
17  the first African-American male they saw in the area.
18  First, did you follow along with me?
19      A    Yes.
20      Q    How do you know you were the first
21  African-American male they saw in the area?
22      A    I can't say I was the first person they saw,
23  but -- hold on one second.  Can I ask you something?
24      Q    No.  You answer the question, and then you
25  talk to your attorney.

**Alonzo D. Jones**
**August 14, 2019**

18

1          MS. THOMPSON:  He actually did answer.
2  He said he can't say he's the first person they saw,
3  so he actually did answer.  So now he's asking for
4  consultation with his attorney.
5  BY MR. SUMMERS:
6      Q    Is that your answer, sir?  You don't know?
7      A    Yes.
8          MR. SUMMERS:  Okay.  All right.  Go
9  ahead.
10         MS. THOMPSON:  Okay.  Step out.
11         (Recess taken from 10:20 a.m. until
12  10:24 a.m.)
13  BY MR. SUMMERS:
14     Q    Ready, Mr. Jones?
15     A    Yes, sir.
16     Q    Did you have adequate time to talk to your
17  counsel?
18     A    Yes, sir.
19     Q    Going back to Paragraph 24 where you allege,
20  among other things, that you were the first
21  African-American male they saw in the area, was there
22  anyone else at all in the area?
23     A    I couldn't verify, sir, that.  When they
24  seen me, I was almost ran into a wall.  Why?  I
25  didn't know, and I kind of got out of the way.  Then

19

1  when they told me they were police, when I got a
2  distance from them and I asked them, what's this all
3  about.
4      Q    Okay.  And I recall you telling us that the
5  first day we were here, but I guess just in general
6  other than you and the police, was there anyone else
7  in the area?
8      A    Not that I seen.
9      Q    Okay.  Read Paragraph 25 to yourself,
10  please.  Did you get a chance to read that?
11     A    Yes, sir.
12     Q    It starts out by saying Officer Gartrell
13  with the approval and direction of District Attorney
14  Sunday.  Do you know what, if anything, District
15  Attorney Sunday approved?
16     A    No, I don't.
17     Q    Do you know what, if anything, District
18  Attorney Sunday directed?
19     A    No, sir.
20     Q    And the sentence goes on to talk about a
21  search warrant.  Do you know what, if any, role
22  District Attorney David Sunday had in applying for a
23  search warrant?
24     A    Not that I know of, sir.  He was, I guess,
25  basically sent to me for whatever purpose that says

20

1  there.  Something about me meeting with a plaintiff.
2  I was the only person there.  How could I be meeting
3  with anybody?
4      Q    Let's break this down a little bit.  I just
5  want to make sure we're on the same page.  Do you
6  know, if any, role District Attorney David Sunday had
7  related to applying for a search warrant?
8      A    No, I don't, sir.
9      Q    That same paragraph refers to falsifying an
10  affidavit.  Do you know -- first of all, are you
11  alleging that District Attorney David Sunday had any
12  role in falsifying an affidavit?
13     A    I know, sir, that things were said about me
14  that weren't true.  And when we got down to that
15  spot, like I said, I was searched and everything.  I
16  didn't have anything again.  He said I see you
17  moving, do you have anything in your buttocks.  And
18  I'm like what are you talking about, sir.
19         I'm sitting there uncomfortable with
20  handcuffs behind my back that are real close and I
21  got short arms.  They're tight.  It hurts.  He said
22  well, I think you got something in your buttocks.
23  The officer that's down there, I don't know if it's
24  the same exact officer here, I'm not sure, but he
25  asked me to pull my pants down, and I did exactly

21

1  what they told me to do.  Proceeded.  I bent over so
2  on and so forth.  I don't have anything, sir.
3         Now, what is this all pertaining to, and I
4  kept asking him the same question.  We still think
5  you have something, sir, but I don't.  That's what I
6  told him.
7      Q    And those people that you were just
8  referring to in your discussion, those were the
9  police officers; correct?
10     A    Yes.
11     Q    And this gentleman down to my right, your
12  left, I'm sure he's going to have a ton of questions
13  about your interaction with those police officers,
14  but I represent District Attorney David Sunday.  So
15  that's why I'm trying to focus on him.
16     A    Okay.
17     Q    Do you know what role, if any, he had
18  regarding falsifying an affidavit as you allege in
19  Paragraph 25 of your complaint?
20     A    Do I know of anything he had falsify -- say
21  that again.  Falsify?
22     Q    So David Sunday, that's all I'm asking about
23  right now.  Do you know what role he had in
24  falsifying the affidavit as you allege in Paragraph
25  25 of your complaint?

**Alonzo D. Jones**
**August 14, 2019**

---

22

1    A   I don't have any knowledge of whether he was
2  the person who falsified it in general. But when I
3  was arrested at that location, I was, like they said,
4  free of any drugs or contraband, and I was the only
5  person walking through the alleyway at that time.
6        When we got down to the station, like I said
7  before, they asked me to pull my pants down and so on
8  and so forth. I did that, and I didn't have anything
9  again. I was asked to get my stuff and go to the
10 York Hospital or whatever, and they're going to
11 search me or something. They don't believe what I
12 was telling them.
13   Q   And that was all by police officers; right?
14   A   Yes. They said we don't believe nothing
15 you're saying. We're going to take you to York
16 Hospital and get you searched.
17   Q   All right. And I'm not trying to trick you.
18 I think your answer is I don't know, but I need you
19 to say it. If you have a different answer, let us
20 know.
21       Do you know what role, if any, District
22 Attorney David Sunday had in falsifying the affidavit
23 as you allege in Paragraph 25?
24   A   Falsify? I don't know whether he has
25 anything to do with the falsifying. But if he had

---

23

1  played a role with those officers that were there
2  that day, then more likely what they did was take me
3  into custody for something that I didn't have.
4  That's all I can get out of this what you're trying
5  to get.
6    Q   Do you have any personal knowledge that he
7  played a role in preparing the affidavit?
8    A   Like whether I know him? No, sir, I don't
9  know him.
10       MS. THOMPSON: Object to the form of
11 the question.
12   A   I don't know. I don't know what you're
13 saying, sir, seriously, if he has any role in that.
14 BY MR. SUMMERS:
15   Q   I'm just trying to flush out your
16 allegations. So if you don't know, you're allowed to
17 say I don't know.
18   A   Then I don't know, sir. I don't.
19   Q   Let's look at Paragraph 28. Did you get a
20 chance to read that to yourself?
21   A   Mm-hmm.
22   Q   Don't forget you have to say yes or no.
23   A   Yes, sir. I'm sorry.
24   Q   That's okay. We went over your medical
25 history the first day, so I want to kind of flip to

---

24

1  towards the end of Paragraph 28. It alleges that
2  there's a loss of employment. You didn't lose any
3  employment because of this arrest, did you?
4    A   Yes, sir. I was told from my Social
5  Security that we see you have a case pending over
6  your head, and I asked them well, what do you mean,
7  and they said we see you have a case pending over
8  your head of some charge. And I'm like well. They
9  said that's going to like put a hold on your Social
10 Security basically.
11   Q   Your Social Security Disability?
12   A   Yes, sir.
13   Q   Okay.
14   A   You know what I mean?
15   Q   So the loss of employment that you refer to
16 in Paragraph 28 refers to your Social Security
17 Disability?
18   A   Yes.
19   Q   Okay. And then it also says the inability
20 to gain employment. What does that refer to?
21   A   To be able to get a job.
22   Q   Okay. If I understood you from your first
23 day in here, you have some medical condition that
24 prevents you from getting a job; correct?
25   A   Yes.

---

25

1    Q   And that's completely unrelated to what
2  we're here for; correct?
3    A   Well, we're not here for me getting a job.
4    Q   Well, actually you did allege that, so maybe
5  it was just extra language in there you didn't really
6  mean, so that's why I'm trying to flush this out.
7  Your inability to get a job relates to your seizures;
8  correct?
9    A   Yes, sir.
10   Q   And that was way before this arrest;
11 correct?
12   A   Yes.
13   Q   Okay. So there's no -- this arrest didn't
14 cause you to not be able to get a job, did it?
15   A   I say it caused me to not get my benefits
16 for my Social Security.
17   Q   Right. And that's it?
18   A   I receive Social Security benefits.
19   Q   Right. I just want to make sure we're not
20 referring to anything else because it says loss of
21 employment and the inability to gain employment, so
22 all that refers to your Social Security Disability;
23 correct?
24   A   My Social Security, yes, sir.
25   Q   Okay. All right. Then it says loss of

---

**Alonzo D. Jones**
**August 14, 2019**

26

1  reputation.  What does that mean?
2      A    Well --
3          MS. THOMPSON:  Objection to the form
4  of the question.
5  BY MR. SUMMERS:
6      Q    You can answer.
7      A    My loss of reputation to me that only mean
8  my presence out in the streets.
9      Q    Your friends out in the streets?
10     A    My presence.  I'm sorry.
11     Q    Your presence?
12     A    Yeah, like seeing me, basically being able
13  to see me out in the streets.
14     Q    During the time period when you were
15  incarcerated?
16     A    Yes.
17     Q    And remind me again what period was that?
18     A    February 8th, 2017, I got arrested.
19     Q    And how long were you incarcerated?
20     A    For say a month and a half.
21     Q    Okay.  So something must lead you to believe
22  people knew you weren't present on the streets, is
23  that correct?
24     A    Well, a lot of my family knew I wasn't
25  present.  They didn't see me.

27

1      Q    Okay.  And did they learn where you were?
2      A    For a minute they didn't until I got out.
3  Nobody knew where I was at until I got out of prison.
4      Q    It sounds like you were incarcerated for
5  about six weeks; correct?
6      A    Yeah, so all together six weeks.
7      Q    Was that at York County Prison?
8      A    Yes, sir.
9      Q    Were you able to call people?
10     A    Yes.  I made calls to get out.
11     Q    Did you tell your family where you were?
12     A    Yes, my mother.
13     Q    All right.  So other than the fact that some
14  of your friends may not have known where you were,
15  was there any other loss of reputation?
16     A    No, sir.
17     Q    It says loss of property.  What type of
18  property did you lose?
19     A    My phone, a couple dollars I had.  I had $13
20  in my pocket.  I never seen that back.  Like that.
21  That's about it.  My phone and a couple bucks that I
22  had in my pocket, 13 bucks I had in my pocket.
23     Q    What type of phone was it?
24     A    I think it was a disposable at the time.
25  It's been a minute since I had it.  I think it was

28

1  like a phone you could buy and put minutes on.
2      Q    Like a flip phone?
3      A    No.  It was a flat screen, but you could buy
4  minutes and put it on it.  Like a prepaid phone.
5      Q    Okay.  How much does something like that
6  cost?
7      A    Probably 40 bucks.
8      Q    Okay.  Any other property you can think of
9  that you lost other than your $13 and your phone?
10     A    Well, as far as like being my manhood in
11  general.  I mean that was just like -- like what I
12  went for before I got put into York County Prison was
13  terrible.  That's all.
14     Q    Okay.  I just want to talk about property
15  right now.
16     A    Well, other than that, like my -- other than
17  that, that's the only property.
18     Q    Okay.  And when you say your manhood, what
19  does that mean?
20     A    As far as being a man what they put me
21  through.
22     Q    And what did they put you through?
23     A    Well, searching me several times, and
24  there's nothing to be found.  And then you take me to
25  York Hospital and you strip search me in front of two

29

1  police officers watching me.  That's very
2  disrespectful on my behalf.
3      Q    Was there anyone there other than the police
4  officers and the medical people?
5      A    The doctor himself that did the procedure.
6      Q    Okay.  So the police officers and the
7  doctor; correct?
8      A    Yes, sir.
9      Q    Anyone else?
10     A    That's it, sir.
11     Q    Okay.  Are you aware of any facts that lead
12  you to conclude that District Attorney David Sunday
13  participated in the search that you just described?
14          MS. THOMPSON:  Objection to the form
15  of the question.
16     A    I don't know, sir.  I don't know.
17  BY MR. SUMMERS:
18     Q    So are you aware of any facts, is the answer
19  I don't know?
20     A    I don't know.
21     Q    Can you read Paragraph 31 to yourself,
22  please.
23     A    Okay.  I read it.
24     Q    Okay.  Do you believe that to be true?
25     A    Not because of my race.

**Alonzo D. Jones**
**August 14, 2019**

30

1    Q     Okay. Why do you believe that the -- what
2  was the reason if it wasn't your race?
3    A     A misunderstanding is what I looked at it
4  as.
5    Q     Anything else other than a misunderstanding?
6    A     A misunderstanding is all I know.
7    Q     Okay. When you say misunderstanding, what
8  does that mean?
9    A     Of identity of a person they were really
10 looking for. Were they looking for me or were they
11 looking for somebody else?
12   Q     Okay. And you say that because you say you
13 weren't guilty of the charges; correct?
14   A     Yes, plus I wasn't -- I didn't have any
15 drugs on me. I didn't have drugs. To quote,
16 unquote, what they were stating I didn't have drugs
17 for none of that stuff, so I was like -- it's like
18 weird basically.
19   Q     All right. So this other person who you
20 believe was responsible, you don't know who that
21 person is, do you?
22        MS. THOMPSON: Objection to the form
23 of the question. Calls for speculation.
24 BY MR. SUMMERS:
25   Q     Did you understand my question?

31

1    A     Say that again, sir.
2    Q     Sure. You told me you thought it was a
3  misunderstanding. It must have been someone else.
4  Is that what you said? Because it wasn't you; right?
5    A     I just said it must've been a
6  misunderstanding because I wasn't there for what they
7  were stating.
8    Q     Okay.
9    A     I was headed to a friend's house basically,
10 and I almost got ran over into a wall.
11   Q     All right. So is it your testimony that you
12 believe there was a misunderstanding that they
13 confused you with someone else?
14   A     That was --
15        MS. THOMPSON: Objection to the form
16 of the question.
17 BY MR. SUMMERS:
18   Q     You can answer. As a reminder, you're
19 allowed to say I don't know if that's the truthful
20 answer.
21   A     Well, say that again what you just said.
22   Q     Well, the instruction I gave you was you are
23 allowed to say I don't know if that is a truthful
24 answer.
25   A     Yes.

32

1    Q     Okay. But you told me there was a
2  misunderstanding, so that was the purpose of my
3  follow-up question.
4    A     Yes.
5    Q     Is it your testimony that there was a
6  misunderstanding because they essentially got the
7  wrong guy?
8    A     No. That's what I looked at it as. That's
9  how I looked at it.
10   Q     And I assume you're going to say I don't
11 know, so I'm not trying to trick you, but do you know
12 what guy you thought that they should have got?
13   A     No, I don't.
14   Q     All right. Paragraph 32, just read that to
15 yourself.
16   A     Can I ask you a question?
17   Q     Sure.
18   A     When they say each Defendant's actions, who
19 are they specifying?
20   Q     I thought I said 32, but just read 32 to
21 yourself.
22   A     I just read 32.
23   Q     Okay. Have we discussed all the
24 humiliation, harassment, and disparagement that you
25 suffered?

33

1    A     Have we discussed it?
2    Q     Yes. I don't want to go over things. I
3  don't want to repeat things so that's why I'm asking.
4  If we already discussed it, I'm not going to ask you
5  any more questions.
6        MS. THOMPSON: Objection to the form
7  of the question.
8  BY MR. SUMMERS:
9    Q     If we haven't discussed it, I want to know
10 what you're going to say.
11        MS. THOMPSON: Same objection.
12   A     Well, I'm not too sure what you're trying to
13 get at, so I prefer not to answer that like that
14 right now. I don't know what you're trying to say.
15 BY MR. SUMMERS:
16   Q     Paragraph 32 you allege Plaintiff suffered
17 humiliation. You talked about your manhood.
18   A     Yes.
19   Q     But is there anything else that relates to
20 this humiliation allegation?
21   A     Yes, sir. I was placed through a CAT scan,
22 and my medical records in York Hospital verify that
23 Mr. Jones cannot go through a CAT scan or MRI for my
24 head or for my neck down I can go. From my head down
25 I cannot. They put me through the same machine that

**Alonzo D. Jones**
**August 14, 2019**

34

1  I wasn't supposed to go through, so that might cause
2  more problems for me I would say. I'm having more
3  morning sicknesses from that.
4  **Q   I didn't hear you.**
5  A   Morning sicknesses.
6  **Q   Morning sickness?**
7  A   Yes.
8  **Q   Anything else that relates to humiliation?**
9  A   And it's been like brought down to the
10 lowest form of a person watching me being stripped
11 search. It was very disgusting.
12 **Q   Anything else?**
13 A   I was roughed a little bit. Had an abrasion
14 on my lip and placed in York County Prison for what
15 reason they still didn't even know.
16 **Q   Anything else?**
17 A   Loss of time sitting in York County Prison.
18 **Q   Anything else?**
19 A   A loss of my Social Security which I stated.
20 **Q   Anything else?**
21 A   And falsely being accused.
22 **Q   Say that again.**
23 A   Falsely being accused.
24 **Q   Anything else?**
25 A   That's probably it that I can think of.

35

1  **Q   And then for harassment, is there anything**
2  **in addition to what we've already discussed?**
3  A   I don't understand what you mean.
4  **Q   It says Plaintiff suffered humiliation,**
5  **harassment. So we've talked about humiliation. Now**
6  **we're moving on to harassment. Is there anything**
7  **additional?**
8          MS. THOMPSON: Object to the form of
9  the question.
10 BY MR. SUMMERS:
11 **Q   Anything we haven't discussed yet?**
12 A   I'm not sure, sir. I'm not sure.
13 **Q   And disparagement, is there anything we**
14 **haven't discussed yet?**
15 A   Well, there's still some things we did not
16 discuss.
17 **Q   Well, related to your humiliation,**
18 **harassment or disparagement, what didn't we discuss?**
19 A   Basically being falsely accused.
20 **Q   Okay. Anything else?**
21 A   Strip searched several times and still being
22 falsely accused. Placed through a CAT scan but still
23 falsely accused. Placed in York County Prison, still
24 falsely accused. I had to stay in there that day
25 without my medication which caused my blood pressure

36

1  to be high, could've had a stroke or a heart attack.
2  **Q   I didn't catch that. Can you speak up a**
3  **little bit. You're very soft spoken.**
4  A   I'm sorry. I said beings that I was there,
5  too, that night and I didn't have my medication, my
6  blood pressure was high. I could've had a stroke or
7  a heart attack, so I mean other than that pain and
8  suffering.
9  **Q   Have we covered everything?**
10 A   Most of it, yes.
11 **Q   What part didn't we cover?**
12 A   Basically any other questions that you may
13 have to ask me.
14 **Q   Well, I'm really just focusing on the**
15 **humiliation, harassment, and disparagement. If we**
16 **covered everything, that's fine. We'll move on. But**
17 **if we haven't, I want to know what it is.**
18 A   Beings having more morning sicknesses and
19 all that, yes, I basically said everything.
20 **Q   Okay. All right. Thank you. Can you read**
21 **Paragraph 34 to yourself, please.**
22 A   Yes. I would agree with that.
23 **Q   Okay. Paragraph 34, what do you believe you**
24 **were denied because of your race?**
25 A   Well, my rights in general, you know what I

37

1  mean? If you sit there and just look at me and judge
2  me because you think I look like a bad person or so
3  on and so forth.
4  **Q   Who judged you because, as you say, you look**
5  **like a bad person?**
6  A   Well, the people that quote, unquote, stated
7  they had me under surveillance, you know what I mean,
8  which is a bunch of nonsense. And then them stating
9  that I was supposed to meet somebody which was a
10 bunch of nonsense because there was nobody there with
11 me in the alleyway.
12         And what happened along the way of, you know
13 what I mean, going through this whole process. It
14 took a whole year and a half just to verify that
15 everything they put down in black and white was
16 basically a lie.
17 **Q   Okay. And I understand your general**
18 **allegations. What I'm asking you is what did they do**
19 **because of your race?**
20         MS. THOMPSON: Objection to the form
21 of the question. Asked and answered.
22 A   Beings I don't understand fully what you
23 mean, I don't want to answer that because I don't
24 want to say nothing too wrong.
25 BY MR. SUMMERS:

**Alonzo D. Jones**
**August 14, 2019**

---

38

1    Q    Let me ask this a different way.  You I
2  thought said that they treated you different because
3  they thought you looked like a bad guy.  Did you say
4  something like that?
5         MS. THOMPSON:  Objection to the form
6  of the question.
7    A    No, sir.  I said because somebody might
8  think you look like a bad person or so on and so
9  forth, you know what I mean?
10 BY MR. SUMMERS:
11   Q    When you say someone may think that, that
12 leads me to conclude that you're assuming something.
13 Is that what you're saying?
14   A    Well, you look at me --
15        MS. THOMPSON:  I'm sorry.  You got to
16 hold on.  Objection to the form of the question.  Now
17 you can answer.
18   A    Sorry.  I was just stating that basically if
19 somebody looked at me and thought that I was a bad
20 person they were looking for, then that's probably
21 why I was approached basically.  That's about it.
22 BY MR. SUMMERS:
23   Q    Are you assuming that or did someone tell
24 you that?
25   A    No.  That's what I'm assuming.

---

39

1    Q    Can you flip to Paragraph 38, please?  Did
2  you get a chance to read that?
3    A    Yes.  I'm trying to understand what this
4  part right at the bottom means.  It state law caused
5  a -- what's that?  Contribution to the -- is that
6  prosecution of Plaintiff?
7    Q    I'm not going to ask you any questions about
8  that part of the sentence, and I think your answer is
9  going to be I don't know, but it says that the County
10 of York and District Attorney Sunday are
11 policymakers.
12      Again, I'm assuming your answer is I don't
13 know, but you tell me if I'm wrong.  Do you know
14 what, if any, policies District Attorney David Sunday
15 implements?
16   A    Well, I don't know Mr. Sunday.  That's why I
17 couldn't tell you that.
18   Q    Okay.  All right.  Can you flip to Paragraph
19 41, please.  Just read it to yourself.
20   A    Okay.  I read it.
21   Q    Okay.  Now, again, I represent District
22 Attorney David Sunday, so that's the focus of my
23 questions.  You allege that he failed to properly
24 train and supervise the involved police officers in
25 procedures concerning identifications.

---

40

1         My question is what training did District
2  Attorney David Sunday fail to provide?
3         MS. THOMPSON:  Objection to the form
4  of the question.
5  BY MR. SUMMERS:
6    Q    Again, you're allowed to say I don't know if
7  you don't know.
8    A    Well, I don't know, sir.  I don't know.
9    Q    And similarly, do you know what District
10 Attorney Sunday failed to supervise?
11   A    No, sir.
12        MS. THOMPSON:  I'm sorry.  Hold on.
13 Objection to the form of the question.  Now you
14 answer.
15 BY MR. SUMMERS:
16   Q    Do you know?
17   A    I'm not sure what you're trying to --
18   Q    I'm trying to get at -- I mean you filed a
19 federal lawsuit against District Attorney David
20 Sunday, so I'm trying to figure out the basis of
21 that.  What do you believe that he failed to properly
22 train and supervise?  What should he have done?
23   A    Well, I have to verify.  I don't
24 understand what he would have to do because I'm not
25 Mr. Sunday.  Beings that I'm not Mr. Sunday, I

---

41

1  couldn't tell you, you know what I mean, what he
2  should have or shouldn't have done.
3         But what was done to me in a sense was if he
4  didn't have probable cause or so on and so forth, why
5  you're harassing this man.  That's what I was getting
6  at.
7    Q    And I appreciate that, and I really want to
8  focus on District Attorney David Sunday because
9  that's my client.  What role did he have to do with
10 what you just described?
11        MS. THOMPSON:  Objection to the form
12 of the question.  Now you answer.
13   A    I don't know, sir.
14 BY MR. SUMMERS:
15   Q    Okay.  Do you believe that District Attorney
16 David Sunday racially profiled you?
17        MS. THOMPSON:  Objection to the form
18 of the question.
19   A    I couldn't say.  I would not be able to
20 verify you fully with that.
21 BY MR. SUMMERS:
22   Q    Are you aware of any facts that lead you to
23 conclude that he racially profiled you?
24        MS. THOMPSON:  Objection to the form
25 of the question.

---

Alonzo D. Jones
August 14, 2019

42

1    A    No, sir. I know myself. All I know is what
2   was done to me. And whether he did that out of
3   racism, I couldn't verify whether it was racial or
4   not.
5   BY MR. SUMMERS:
6    **Q    Again, I understand you'll have some**
7   **testimony about the police officers, but I'm focusing**
8   **on District Attorney David Sunday. You said I don't**
9   **know whether he did it out of racism or something**
10  **like that. What is it that he did?**
11          MS. THOMPSON: I'm going to object to
12  the form of that question. Now you can answer.
13   A    Beings that I'm not fully understanding what
14  you're getting at, I'd rather not speak on that
15  so I do not incriminate myself, you know what I mean,
16  because I don't understand what you're trying to say
17  right there.
18  BY MR. SUMMERS:
19   **Q    I'm just trying to figure out what David**
20  **Sunday -- what you allege David Sunday did.**
21   A    What I allege he did?
22   **Q    Yes. Do you allege he did anything to you?**
23   A    Beings I'm not fully understanding what
24  you're saying, I'd rather not say anything to
25  incriminate myself, you know what I mean?

43

1    **Q    Do you understand what allege means?**
2          MS. THOMPSON: Just to clarify.
3   Mr. Jones, if you don't understand a question versus
4   saying I'm not going to answer, you ask for
5   explanation. Do you understand? That's what you're
6   supposed to do is ask for clarification of the
7   question.
8    A    Okay.
9          MS. THOMPSON: All right.
10  BY MR. SUMMERS:
11   **Q    What I'm trying to focus on here, what did**
12  **District Attorney David Sunday do to you or didn't do**
13  **to you that you think was inappropriate?**
14          MS. THOMPSON: I'm objecting to the
15  form of the question. Now you can answer.
16   A    All I can say, is if he was the head
17  person alone with this procedure, then he put me in a
18  situation of being humiliated more than likely.
19  BY MR. SUMMERS:
20   **Q    So you said if he is the head person. You**
21  **don't know whether or not he is the head person?**
22   A    Because I don't know this man in general. I
23  don't know him.
24   **Q    Okay. And then you referred to the**
25  **procedure, that's the -- what we've discussed being**

44

1   arrested --
2    A    Yes.
3    **Q    -- and charged; correct? And you don't know**
4   **what role, if any, he had in that, do you?**
5          MS. THOMPSON: I object to the form of
6   the question. Now you answer.
7    A    I know if his name is on there, more likely
8   he had something to do with it.
9   BY MR. SUMMERS:
10   **Q    What leads you to --**
11   A    Because his name would be on this paper
12  verifying that he has anything to do with it. So if
13  I was arrested, more likely he was somebody who
14  agreed with what was going to happen that day so on
15  and so forth.
16   **Q    Do you understand that these are the facts**
17  **in Exhibit 1 that you allege?**
18   A    That I allege?
19   **Q    Right. These are your facts.**
20   A    Hold on. Now you're saying something that
21  he says here, and then you're saying something that I
22  allege.
23   **Q    No, no, no. What I'm saying is everything**
24  **in this document is your allegations. Do you**
25  **understand that?**

45

1    A    I understand what you're saying now, okay.
2   So you're saying here --
3    **Q    I'm not saying. You're saying.**
4          MS. THOMPSON: Again, for clarity so
5   it's not made a joke of, I think if you need to have
6   understanding of what the document is, you need to
7   ask the questions for specifics and maybe some
8   explanation, again, if it needs to be, what the
9   document is, but you have to ask if you don't
10  understand.
11   A    Okay. Could you explain to me this, sir?
12  BY MR. SUMMERS:
13   **Q    Sure. This complaint is a complaint that**
14  **you filed.**
15   A    Yes, sir.
16   **Q    In the Middle District of Pennsylvania. In**
17  **fact, let's flip to Page 17.**
18   A    Page 17?
19   **Q    Yes. It says verification there. Do you**
20  **see that?**
21   A    Yes.
22   **Q    And it says I declare under penalty of**
23  **perjury that the foregoing is true and correct. Did**
24  **you follow along with me?**
25   A    Yes, sir.

**Alonzo D. Jones**
**August 14, 2019**

46

1    Q    And then underneath that, it's your name;
2  correct?
3    A    Yes, sir.
4    Q    Okay.  So I understand you might not know
5  the nuances of perjury, but you generally understood
6  that you had to tell the truth; correct?
7    A    Yes, sir.
8    Q    Okay.  So I want you to focus on David
9  Sunday.  What role, if any, did he have in racially
10 profiling you?
11        MS. THOMPSON:  I'm going to object to
12 the form of the question.
13    A    All I can tell you is I don't know.
14 BY MR. SUMMERS:
15    Q    That's fine.  All right.  Let's look at
16 Paragraph 42, please.  Just read it to yourself.  Let
17 me know when you're done.
18    A    40?
19    Q    42.
20    A    I want to ask a question.
21    Q    Okay.
22    A    It says custom of sustaining skin color.
23    Q    Substituting.
24    A    Substituting?
25    Q    Yes.

47

1    A    Skin color, race.  What's that?  Authentic?
2    Q    Ethnicity.
3    A    Ethnicity.  I'm trying to figure out what's
4  ethnicity.  What's that right there, ethnicity?
5    Q    In general it refers to either you're
6  African-American.
7    A    Okay.
8        MS. THOMPSON:  Objection to the form
9  of the question and answer.
10 BY MR. SUMMERS:
11    Q    Or if you mean something different, you can
12 tell me.
13    A    Okay.  I've read it.
14    Q    Okay.
15    A    So basically you're asking me do I feel I
16 was approached for racist figures, I guess.  Would it
17 be racist figures?
18    Q    Well, my first question is you had
19 previously said that there was a misunderstanding.
20 Do you believe there was a misunderstanding regarding
21 substituting skin color, race, ethnicity, and/or
22 national origin?
23    A    Well, I'm not fully understanding what it's
24 trying to say really.  Like are you asking me do I
25 feel like they're approaching me because of my skin

48

1  color and what I look like?
2    Q    Yeah.  What's your answer to that question?
3    A    That's more likely what I think that as.
4  Looked at me and thought well, it's a black male
5  right there.  He looks like he's probably doing
6  something he shouldn't be doing, you know what I
7  mean?
8    Q    And other than just your opinion, what leads
9  you to conclude that the police arrested you because
10 of your skin color?
11    A    Well, if you looking for a black male.
12    Q    What leads you to believe that they were
13 looking for a black male?
14        MS. THOMPSON:  First of all, objection
15 to the form of the question.  Calls for speculation.
16 You can answer.
17    A    No.  I was just justifying if you were
18 looking for a black male, then...
19 BY MR. SUMMERS:
20    Q    Are you aware of any facts that lead you to
21 conclude that they were looking for a black male?
22    A    No.  I'm just justifying if they were
23 looking for a black male, then that's probably why.
24    Q    Okay.  And maybe we're talking around each
25 other.  Are you -- what leads you to conclude, if

49

1  anything, that they were looking for a black male?
2        MS. THOMPSON:  Objection to the form
3  of the question.  Calls for speculation.
4    A    The only thing that happened to make me
5  think that is that they arrested me because I'm a
6  black man.  That's it.  Other than that...
7  BY MR. SUMMERS:
8    Q    Anything other than the fact that you are,
9  in fact, a black man?
10    A    State that again.
11    Q    Sure.  I'm trying to figure out why you
12 believe the police arrested you.
13    A    Because they said I was someone they were
14 looking for.
15    Q    Okay.
16    A    That's why.
17    Q    And do you believe that they were looking
18 for you because you were a black man?
19    A    All I know is they were looking for
20 somebody, and it wasn't me.
21    Q    Okay.
22    A    Point-blank.  I knew that for a fact.
23    Q    All right.
24    A    They were looking for somebody, and it
25 wasn't me.

**Alonzo D. Jones**
**August 14, 2019**

50

1    Q    All right. And you're not aware of who this
2  other person might have been; correct?
3    A    No, sir.
4    Q    So it could have been a female or a male;
5  correct?
6         MS. THOMPSON:  Objection to the form
7  of the question. Calls for speculation.
8  BY MR. SUMMERS:
9    Q    Correct?  It could have been a male or
10  female; right?
11    A    I wouldn't say that. I mean if they were
12  looking for a male.
13    Q    But you don't know whether they were -- you
14  don't --
15    A    I couldn't -- why wouldn't I know if they're
16  arresting a black man? That's what I'm justifying
17  because you're arresting a black man. You're looking
18  for a black male. That's what I'm going off of. I
19  mean if you're arresting a black man, you must be
20  looking for a black male. That's the only thing I'm
21  going off of.
22    Q    And because you were innocent of the
23  charges, you knew you were the wrong black man;
24  correct?
25    A    Yes. I knew I was wrongfully accused, and

51

1  what they did do to me was out-of-pocket.
2    Q    Okay.
3    A    Yes, sir.
4    Q    Read Paragraph 43 to yourself, please.
5    A    Okay.
6    Q    Now, it refers to the training and
7  supervision of the officers involved. Do you know
8  what training the officers involved had?
9    A    No, sir.
10    Q    Do you know what training that you believe
11  they should have had?
12    A    No, sir.
13    Q    Do you believe the police officers have a
14  policy or a custom of fabricating information?
15         MS. THOMPSON:  Objection to the form
16  of the question, but go ahead.
17    A    I don't know.
18  BY MR. SUMMERS:
19    Q    Do you know what embellishing means?
20    A    No, sir.
21    Q    Exaggerating?
22    A    Exaggerating, I know what that is.
23    Q    Do you believe the police officers have a
24  policy or custom of embellishing information?
25         MS. THOMPSON:  Objection to the form

52

1  of the question. Go ahead.
2    A    I don't know what that word means.
3  BY MR. SUMMERS:
4    Q    Do you believe the officers -- do you know
5  what exaggerating means; correct?
6    A    Yes.
7    Q    Do you believe the officers have a policy or
8  custom of exaggerating information?
9         MS. THOMPSON:  Objection to the form
10  of the question. Go ahead.
11    A    Do I believe they have -- what do you mean?
12  They have the right to or what do you mean?
13  BY MR. SUMMERS:
14    Q    Do you believe that they regularly do it?
15    A    That they regularly do it?  It's on TV a
16  lot, believe me. Sorry to say that. It's true.
17  It's on TV a lot, I mean.
18    Q    I'm assuming you just mean in general, not
19  these particular police officers?
20         MS. THOMPSON:  Objection to the form
21  of the question.
22  BY MR. SUMMERS:
23    Q    Well, I'll ask it then. Are these police
24  officers named in this complaint regularly on TV?
25    A    No, sir. No, sir. That's not actually what

53

1  I was trying to get across. The only thing I said is
2  on TV you see police officers do things that are a
3  little out-of-pocket at times, you know what I mean?
4  And that police officer is not the best police
5  officer on your force.
6    Q    I thought that's what you meant, but when
7  your attorney objects, then I have to follow up with
8  questions.
9         MS. THOMPSON:  So, again, objection to
10  that statement as well.
11  BY MR. SUMMERS:
12    Q    Have you -- for these particular police
13  officers named in this case, and their names are at
14  the beginning if you want to look at it again, have
15  you ever had any other interaction with them other
16  than the set of facts that are in your complaint?
17    A    No, sir.
18    Q    Do you have any friends or relatives that
19  have interacted with these police officers?
20    A    No, sir.
21    Q    So your sole involvement with these
22  particular police officers relate to the facts
23  identified in this complaint; correct?
24    A    Say that again.
25    Q    Your only involvement with these particular

**Alonzo D. Jones**
**August 14, 2019**

54

1  police officers relate to the incident identified in
2  this complaint; correct?
3      A    Basically, yes.
4      Q    Okay.  All right.  That sentence also refers
5  to omitting material information.  Omitting means
6  leaving out.  Are you aware of any information the
7  police officers left out of affidavits?
8          MS. THOMPSON:  Objection to the form
9  of the question.  Go ahead.
10     A    What do you mean by that, sir?
11  BY MR. SUMMERS:
12     Q    What did the police officers leave out of
13  the affidavit?
14     A    You mean information-wise?
15     Q    Yes.
16     A    Well, what they wrote down because I have it
17  in my pocket is something totally different that they
18  specified when they went to court, you know what I
19  mean?  Like well, I was checked, so on and so forth
20  and all that stuff.
21          Certain things they stated, put it like
22  that, were switched around.  And then when we got to
23  the courtroom, quote, unquote, their CI that they
24  claimed they had, this person never shows up in a
25  year and a half.  And you tell me if within a year

55

1  and a half why we never seen this person.
2      Q    Okay.  So what does CI mean?
3      A    Correctional informant, I think.
4      Q    Confidential informant maybe?
5      A    Something like that.  I don't know.
6      Q    And you never learned who that person was?
7      A    Yes.  Within a year and a half we never met
8  this person in a courtroom at all.
9      Q    Okay.  And your charges were essentially
10  dismissed because the prosecution did not happen fast
11  enough; correct?
12     A    It was because it was a false -- how would I
13  say it?  A false statement given, you know what I
14  mean?  They stated that I made a transaction or
15  something with a CI, and then they stated that I
16  directed the CI to come to Gas Alley or something
17  like that.
18          And within all these statements that they
19  given, when they came to the judge like given a
20  warrant to come get me, their words to him were we
21  lost our evidence.  Why would that be?
22     Q    Who are you saying said that?
23     A    Oh, that's what they stated.  We lost our
24  evidence.
25     Q    And you're saying they?

56

1      A    The people that adjusted -- they wanted me
2  arrested for that specific day for whatever reason.
3  When we got to the courtroom, they told the judge,
4  somebody that wanted to come get me, we lost our
5  evidence.
6      Q    When you say judge, are you referring to the
7  York County Courthouse?
8      A    Judge James Morgan.  That's the guy that
9  gave the body warrant to come get me I guess.  He
10  specified that you have Mr. Jones locked in York
11  County Prison and you don't have nothing on him.  He
12  was very upset about that.
13     Q    Okay.  And this is the judge that authorized
14  the warrant is what you're saying?
15     A    Yes, Judge James Morgan.
16     Q    All right.  Did you ever appear at the York
17  County Courthouse?
18     A    I was there so many times it was a shame.
19  Like I said, all they kept doing was beating around
20  the bush about, quote, like I said, a CI that was
21  never there, you know what I mean, and stuff that was
22  never there, you know what I mean?
23          Like they said something about marked money.
24  Well, all this stuff that you're stating that was
25  there, where is all this stuff at that you're

57

1  stating?  It's all falsely accusing.  They're
2  accusing me of stuff that you're making up.
3      Q    I understand you're not an attorney, but do
4  you know why your charges were dismissed?
5      A    Lack of evidence is what I came up with.
6  Lack of evidence.  I told my public defender that,
7  you know what I mean, all the evidence they, quote,
8  unquote, gave you, it's a lie.  I know it's a lie.
9          Pictures that she told me and statements
10  that she gave to me when she showed me pictures and I
11  explained to her and she looked at those pictures and
12  was like well, you got a good point there.  I said,
13  of course, because it's a lie.  So I know it.  That's
14  why I wasn't bothered by it.
15     Q    Okay.  So you believe your charges were
16  dismissed based upon lack of evidence?
17     A    Basically, sir.
18     Q    Any other reason that you believe that they
19  were dismissed?
20     A    That's all I could think of at the time,
21  sir.
22     Q    Okay.  You understand that a trial involves
23  a judge and a jury; correct?
24     A    Yes.
25     Q    You never went to a proceeding like with a

**Alonzo D. Jones**
**August 14, 2019**

58

1  judge and jury, did you?
2      A   Yes.
3      **Q   You did?**
4      A   Mm-hmm.
5      **Q   I don't think you did, but you correct me if**
6  **I'm wrong.**
7      A   No, not for this.
8      **Q   Yeah, for this.**
9      A   I'm sorry. I thought you meant -- you said
10  ever. I'm sorry. I misunderstood what you said.
11     **Q   Fair enough. I'm glad you clarified that.**
12  **So for this process you never went to a judge and**
13  **jury; correct?**
14     A   We went to court. But every time we went to
15  see the judge, their excuse was the CI's not here.
16  The CI's in another courtroom. The CI's at a
17  doctor's appointment, some nonsense which, quote,
18  unquote, like I said, there was stuff that they were
19  making up that's a lie because there was no CI.
20  There was no drugs. There was nothing there which
21  you locked me up for.
22        That's what it was, you know what I mean?
23  It was like a bunch of nonsense. You put it together
24  yourself, and you try to get it together off of it,
25  you know what I mean?

59

1        MR. SUMMERS: Okay. I've got to use
2  the restroom. Let's take a break. Mr. Jones, you
3  can stretch your legs, get a drink, go to the
4  bathroom, take a break if you want.
5        (Recess taken from 11:17 a.m. until
6  11:22 a.m.)
7  BY MR. SUMMERS:
8      **Q   Flip to Paragraph 47, please. Just read**
9  **that entire thing to yourself. Let me know when**
10  **you're done. Okay. Did you get a chance to read**
11  **that?**
12     A   Yes, sir.
13     **Q   What prior complaints of racial profiling**
14  **are you referring to in your complaint at Paragraph**
15  **47?**
16     A   Well, being a black male and specifying my
17  rights as a man, I was basically denied, declined,
18  and told that basically shut up and do what we say,
19  you know what I mean?
20        When all was said and done, it came out that
21  I had nothing, like I said, and still I was sent to
22  York County Prison and falsely accused of something I
23  didn't do.
24     **Q   Are you aware of any other complaints**
25  **against York County District Attorney's Office**

60

1  regarding racial profiling?
2      A   Do I know of any?
3      **Q   Yes.**
4      A   Not offhand. Not offhand right at that
5  time.
6      **Q   Can you flip to Paragraph 52, please.**
7      A   Okay.
8      **Q   You can refer to that or read as much as you**
9  **want, but really I want to know -- the very last line**
10  **in that it refers to selective prosecution based upon**
11  **skin color, race or ethnic origin.**
12        **Tell me what you know about selective**
13  **prosecutions by the York County District Attorney's**
14  **Office.**
15        MR. THOMPSON: Objection to the form
16  of the question. Go ahead.
17     A   I don't. I don't know, sir. I don't know.
18  Racial profiling as a basis of suspicion in criminal
19  investigation and of selective prosecution based on
20  skin color, race or ethnic origin.
21     **Q   Right. The District Attorney is also the**
22  **prosecutor, so that's why I'm kind of focusing on**
23  **that part. Are you aware of any selective**
24  **prosecution based upon skin color?**
25     A   No, sir, not that I know of.

61

1      **Q   Are you aware of any selective prosecution**
2  **based upon race?**
3      A   Not that I know of.
4      **Q   Are you aware of any selective prosecution**
5  **based upon ethnic origin?**
6      A   I don't know what that word means, so I
7  can't specify because I don't know what that word
8  means.
9        MR. SUMMERS: That's fine. Chris,
10  I'll let you start asking some questions while I look
11  at my notes. I think I'm done. Do you want to
12  switch?
13        MR. BOYLE: Yeah.
14
15        EXAMINATION
16
17  BY MR. BOYLE:
18     **Q   Mr. Jones.**
19     A   Yes.
20     **Q   My name is still Chris Boyle, and I still**
21  **represent Officer Gartrell and Chief Bentzel in the**
22  **lawsuit you bought in federal court. I'm going to**
23  **take over the questioning now.**
24        **We're going to go until about 12:30 when**
25  **your counsel has to take a break to attend to another**

Alonzo D. Jones
August 14, 2019

62

1  important matter. Maybe we'll be done by then, but I
2  think that's unlikely. If we're not done, then we'll
3  come back at 2:00, and we'll finish up there then.
4  All right?
5      A   Yes, sir.
6      Q   Did you understand all the instructions that
7  you've already been given about your deposition?
8      A   Most of them.
9      Q   Okay. What instructions did you not
10 understand? I'll see if I can clarify them for you.
11     A   Certain words that probably were specified
12 that I didn't understand them.
13     Q   Okay. I would ask that if at any point
14 during my questioning you don't understand a word I
15 use or a word that is used in the complaint because
16 we're going to be referring to that again --
17     A   Yes.
18     Q   -- that you ask, and I'll try and clarify it
19 as best as I can so we have a common understanding,
20 and you can answer the question based on that common
21 understanding. Is that acceptable to you?
22     A   Yes, sir.
23     Q   Okay. I understand, sir, that you didn't
24 write the complaint. That you have very able counsel
25 that takes care of that for you, but we do have to

63

1  base the questioning on what's in this document. All
2  right?
3      A   Yes.
4      Q   When was the first time you saw this
5  complaint?
6      A   I can't remember offhand. I'd be lying to
7  you. I don't remember off the top of my head.
8      Q   Well, I'm certainly not looking for you to
9  lie to me. Was it before it was filed in federal
10 court?
11     A   I can't remember. That's all. I can't
12 remember right now.
13     Q   Okay. Did you verify that everything in
14 there was true and correct? I'm not asking you about
15 the legal terms. I'm asking about the facts of what
16 happened to you involving the police and the District
17 Attorney.
18         Did you verify that all those things were
19 true and correct?
20     A   Yes, sir.
21     Q   Okay. Having had the opportunity to look at
22 some of this already today, is there anything that
23 you see today that you feel is not true and correct?
24     A   I haven't read the whole thing myself right
25 now, so I couldn't say I read the whole thing to

64

1  verify the whole thing. Everything in here, certain
2  things that I believe like are twisted and certain
3  words I just don't understand, so it's like...
4      Q   Okay. What do you mean twisted or what in
5  there do you believe is twisted?
6      A   The way they're saying it, is the way
7  they're saying it, explaining it I would say. The
8  way they're explaining it to me.
9      Q   Can you give me an example? Take as long as
10 you need. Look through there and find me something
11 that you believe is twisted, and then we'll discuss
12 it.
13     A   Right now, I'm not seeing anything right now
14 on this paper. I ain't seeing anything right now.
15     Q   When you say this paper, you mean the
16 complaint that you filed in federal court; right?
17     A   Yeah. I don't see anything. That they're
18 stating, that they stated, you know what I mean?
19 This is more like what they're asking me that I said.
20     Q   Okay. When you say they stated, who are you
21 talking about?
22     A   Well, what they stated on paper that I have
23 in my pocket.
24     Q   Okay. What paper do you have in your
25 pocket, sir? Is that it on the table in front of

65

1  you?
2      A   I'm sorry.
3      Q   That's okay.
4      A   This is information that was given to me
5  filed into this.
6      Q   Information that was given to you by whom?
7      A   This is from the Northern -- I guess
8  Northern Regionals and York City Police. I guess
9  they were in a joint task force at the time, so they
10 were look a team, you know what I mean?
11     Q   Okay.
12     A   So it's like a form of both of them all
13 together.
14     Q   So what you're looking at is documents that
15 you received as part of the discovery in your
16 criminal matter?
17     A   Yeah. Like you know what I mean? Just
18 statements of, you know what I mean, what they say
19 they did and they didn't do and certain things that
20 they shouldn't have done that they did, you know what
21 I mean?
22     Q   Okay. And did you look at those documents
23 in preparation for your deposition today?
24     A   Well, I read over these, but most of these
25 are like questions that were from -- more like from

Alonzo D. Jones
August 14, 2019

**66**

1 me and statements that I felt was done to me, stuff
2 that I feel was done to me, too.
3    Q    I think we're talking about two separate
4 things, so let me see if I can clarify it.  The
5 documents that you're looking at right now in your
6 hand that you brought with you to the deposition
7 today and that have been sitting on the table in
8 front of you, did you look at them in preparation to
9 get ready for your deposition today to refresh your
10 memory perhaps?
11    A    Yeah.  I went over these.  I mean I read
12 over them.
13    Q    Okay.  How many pages are there, sir?
14    A    I think four all together.
15        MR. BOYLE:  Okay.  Counsel, I'm going
16 to ask that you take a look at it and make sure
17 there's no privileged material before I ask him to
18 hand them over for me to take a look at them.
19    A    Four pages.
20        MR. BOYLE:  Sandra, do you want to
21 make sure --
22        MS. THOMPSON:  I'm waiting for him to
23 be done his review.
24    A    I'm seeing if any of the people that the
25 names are on this paper.  That's all.  That's what

**67**

1 I'm looking for.
2 BY MR. BOYLE:
3    Q    Sir, all we're asking right now or all I'm
4 asking right now, I believe you've already answered,
5 I asked if you used those documents or referred to
6 those documents to prepare for your deposition here
7 today.
8    A    Yes, sir.  Yes.
9    Q    And you said yes.
10    A    Yes.
11        MR. BOYLE:  Now, I'm going to ask for
12 you to pass them over to your attorney so she
13 can make sure there's no like notes from lawyers or
14 things that are privileged communications.
15        MS. THOMPSON:  It's all the documents
16 that you brought.
17        MR. BOYLE:  Go ahead.  Hand it all on
18 over.
19        MS. THOMPSON:  Hand it to me.
20 BY MR. BOYLE:
21    Q    Okay.  Your counsel has looked over it, and
22 I'm going to assume that there's nothing privileged
23 or she wouldn't have handed it to me.
24        What we have here is an application for a
25 search warrant which appears to have been prepared by

**68**

1 Officer Gartrell.  That's the first page.  The second
2 page is an affidavit of probable cause, and there's
3 some handwritten notes on here.  These handwritten
4 notes in blue, did you write those, sir?
5    A    If they're underlined, yeah, I underlined
6 them.
7    Q    The underlining and the --
8    A    The statements, yes.
9    Q    And the statements, you wrote those?
10    A    Yeah, the statements.
11    Q    All right.  And on the third page is another
12 page of the affidavit of probable cause, and, again,
13 there's some underlining, and it looks like a
14 handwritten note at the bottom, went to hospital and
15 found nothing, officer is a lier, l-i-e-r.  Did you
16 write that, sir?
17    A    Yes.
18    Q    Okay.  Next page is the last page.  It looks
19 like the affidavit of probable cause.  Actually, it's
20 Page 4 of 5.
21    A    One of them might be missing.
22    Q    And one of them appears -- the next page
23 appears to be just the top corner of a page?
24    A    It's probably the fifth one.  It wasn't a
25 lot that was there.  Associated with controlled

**69**

1 substance use or -- it's a piece.  Yeah, a piece of
2 mine is missing.
3    Q    Okay.  I'm going to ask you to hand it back
4 to me.  We're going to ask the nice folks here at the
5 Bar Association to make a copy of all these
6 documents, and then I'll attach them to the record.
7        The last page appears to be the verification
8 for -- you tell me.  Is this the verification for
9 your lawsuit, sir?  Because it appears to be the same
10 as the 17th page of Exhibit 1 except there's an
11 actual signature there rather than a typewritten
12 signature.
13    A    This looks more likely paperwork that was
14 given -- like I got from going through getting this
15 paperwork here.
16    Q    By which you're referring to Exhibit 1?
17    A    No, right here.  I was given this paperwork
18 first.
19    Q    You were given the search warrant paperwork
20 first?
21    A    Yeah, what they, quote, unquote, stated it
22 was for.  There was I guess a verification of the
23 date, you know what I mean, verifying that I got that
24 information.
25    Q    Okay.  So you believe you're verifying on

**Alonzo D. Jones**
**August 14, 2019**

70

1   that document that you got the search warrant
2   application; right?
3       A   Yes.
4       Q   What's the date on that document, sir?
5       A   February 8th, 2019.
6       Q   The same as Page 17 of your lawsuit.  All
7   right.  Why don't you -- we'll put this all together.
8   When we take a break, we will get copies of that, and
9   I may have some questions later.
10          MR. SUMMERS:  Mr. Jones, can you speak
11  up a tad.
12      A   Sorry.
13  BY MR. BOYLE:
14      Q   On that verification page, is that your
15  signature, sir?
16      A   Yes, sir.
17      Q   Okay.  Do you know who Mark Bentzel is?
18      A   No, I don't, sir.
19      Q   Could you describe him to me physically?
20      A   I don't know who he is.
21      Q   Okay.  If I told you he's the chief of
22  police for the Northern York Regional Police
23  Department, would that help you at all in knowing who
24  he is?
25      A   No.

71

1       Q   Okay.  Do you know if you've ever met him
2   before?
3       A   I might have met him, but I'm not sure.  I
4   don't know.  Like when you see somebody's name
5   specifically, I don't know him like right offhand by
6   the name.
7       Q   Is it possible you may have seen his name in
8   the newspaper when certain things happen like a
9   police shooting or something like that?
10      A   No, not that I know of.
11      Q   Okay.  You don't recall ever having
12  meeting -- ever having met him in person, though, is
13  that right?
14      A   In person I have not met him.
15      Q   You were asked a lot of questions today
16  about District Attorney -- and the first day of your
17  deposition about District Attorney Sunday?
18      A   Yes.
19      Q   And you testified, correct me if I'm wrong
20  here, but you testified that you don't know what
21  involvement, if any, District Attorney Sunday had
22  directly in your case.  Is that accurate?
23      A   Yes.  I was stating I don't know
24  specifically myself what his position in that error
25  was.

72

1       Q   Okay.  Would the same be true for those
2   questions if we substituted Chief Bentzel for
3   District Attorney Sunday?
4           MS. THOMPSON:  Objection to the form
5   of the question.  Go ahead.
6   BY MR. BOYLE:
7       Q   Do you understand the question, sir?
8       A   No, I don't, sir.
9       Q   Okay.  You were asked questions what did
10  District Attorney Sunday fail to train the police on
11  as an example.  Do you remember being asked a
12  question like that?
13      A   Yes.
14      Q   Now, if I took out District Attorney Sunday
15  and put in Chief Bentzel and asked you what training
16  did Chief Bentzel fail to provide the police, would
17  the answer be the same as it was for District
18  Attorney Sunday?
19      A   Yes, more likely, sir.
20      Q   What do you mean more likely so?
21      A   No.  I said more likely, sir.
22      Q   More likely, sir.  What do you mean more
23  likely, sir?
24      A   Because everything that was stated was wrong
25  when they did their procedure on me as far as patting

73

1   me down, you know what I mean, so on and so forth.
2       Q   Okay.
3           MS. THOMPSON:  I'm sorry.  I don't
4   believe he was finished his answer.
5           MR. BOYLE:  I was trying to speed up
6   the process, but you're absolutely right.
7   BY MR. BOYLE:
8       Q   Sir, I cut you off.  Please feel free to
9   finish.
10      A   Just basically things that were done to me
11  that day, you know what I mean?  So if they were like
12  say the head guys of this procedure itself, you know
13  what I mean, I don't know them in person like saying
14  I know this person, like we went somewhere together,
15  we talked.  I don't know them in general.  But if
16  they were there and I socialized with them and I made
17  a statement, anything I've stated should be right
18  there in black and white like I stated.
19      Q   I have no idea what that meant, but you --
20      A   Like I said at the beginning, I said to them
21  like she's doing that's written down on paper
22  verifying this is what I said, this is what it was.
23      Q   Okay.  Who did you make this statement
24  before like we're doing today?  Was that to your
25  attorneys?

**Alonzo D. Jones**
**August 14, 2019**

74

1    A    Hold on. Fill me in on what you're saying
2  right there again.
3    Q    Well, that's what I didn't understand.
4    A    You said who I'd make this statement.
5    Q    Yeah. You just described making a
6  statement.
7    A    Yeah, to the officers, the officers I was
8  arrested by.
9    Q    Okay. And you pointed to our court reporter
10  and said that they were taking it down just like she
11  is today.
12    A    She is. She's typing it down. They were
13  writing it down.
14    Q    Okay. Who was writing it down?
15    A    The other officers that were there at the
16  time.
17    Q    Okay. All right. Let's go back to Chief
18  Bentzel, and we'll go from there.
19    A    All right.
20    Q    Do you know anything, any single thing, in
21  relation to your lawsuit that Chief Bentzel did to
22  you himself? Again, the instruction if I don't know
23  is --
24    A    I don't know, sir. I don't know because --
25        MS. THOMPSON: Hold on. He was not --

75

1  he was in the middle of talking. You got to wait.
2  BY MR. SUMMERS:
3    Q    You can finish your answer, sir. Please go
4  ahead.
5        MS. THOMPSON: All right. So if he's
6  finished, objection to the form of the question. Now
7  you go.
8    A    Say that again for me now.
9  BY MR. BOYLE:
10    Q    Are you aware of anything that Chief Bentzel
11  himself did to you in relation to your lawsuit?
12        MS. THOMPSON: Objection to the form
13  of the question. Go ahead.
14    A    I can't say I know anything specifically
15  that he's done wrong to me unless he's the one that,
16  like I said, prescribed for the body warrant. He was
17  saying -- saying he wanted a body warrant certain
18  done to me, but it was never officiated through a
19  warrant. You need a warrant to get a cavity search
20  on me. So when they did so, they did it out of their
21  own means. We're going to do it because we feel we
22  can do it.
23  BY MR. BOYLE:
24    Q    Was Chief Bentzel there when any of that
25  happened?

76

1    A    I'm not sure.
2    Q    Do you have any reason to think that he was?
3    A    If he was part of this procedure, he may
4  have been.
5    Q    Okay. Would you say that because he's the
6  chief of police, and, therefore, you believe he
7  should have?
8    A    Basically, sir.
9    Q    Okay. That's the same thing you said about
10  District Attorney Sunday. Am I correct?
11    A    Yes.
12    Q    Okay. So your basis for suing Chief Bentzel
13  and for suing District Attorney Sunday is because of
14  their positions, their leadership positions in the
15  District Attorney's Office and the police department.
16  Is that accurate?
17        MS. THOMPSON: Objection to the form
18  of the question. Now you go ahead.
19    A    In the sense it would be yes because they
20  were I guess the head officers or procedures at that
21  time, you know what I mean? This is what we're doing
22  and this is what's going to be done.
23  BY MR. BOYLE:
24    Q    Okay. So the answer was yes?
25    A    Yes.

77

1    Q    Okay. I'm going to do everything I can not
2  to ask you the same question that you were already
3  asked. Forgive me if I do, but it also means I might
4  jump around a little bit. All right?
5    A    Yes, sir.
6    Q    You talked about saying that you can't get a
7  CAT scan. Who did you tell that to?
8    A    The doctor that was doing the procedure at
9  the time and the two officers that were right there
10  watching the procedure.
11    Q    Right.
12    A    At the time I let them know that I can't go
13  through the CAT scan because I have a metal plate in
14  my head from a car accident, and they said that
15  magnet inside that could pull it and like cause more
16  medical damage.
17    Q    They being the doctors who put the plate in?
18    A    Yes, and it's in York Hospital records.
19    Q    Okay.
20    A    So it's in the records.
21    Q    And you told that to the doctor at the
22  hospital when the police on this case took you to the
23  hospital?
24    A    Yes.
25    Q    And what did the doctor say?

**Alonzo D. Jones**
**August 14, 2019**

78
1   A   Nothing.  He just went along with the
2   procedure.  He said basically it was like they
3   brought us in here, I'm doing what they told me to
4   do.  Then when he told them that I see nothing in
5   this man, he slammed the door out of anger letting
6   them know you brought this man here for nothing.
7   Q   Okay.  All right.  But you told that doctor
8   you're not allowed to have a CAT scan and the
9   doctor --
10   A   I'm not allowed to have a CAT scan.
11   Q   Let me finish.  Just let me get it out.
12   A   I apologize.
13   Q   It happens a lot.  And if I do it to you,
14   you're going to correct me.  You told all that to the
15   doctor; correct?
16   A   Yes, sir.
17   Q   And the doctor still went ahead and did the
18   CAT scan; correct?
19   A   Yes, sir.
20   Q   Okay.  I'm not trying to show you
21   disrespect.
22   A   No.  I apologize.
23   Q   Again, we can only talk one at a time so
24   that the young lady here can take down everything
25   that we say.  All right.

79
1       On the first day of your deposition you were
2   talking about Social Security benefits and your
3   employment history.  Other than Social Security
4   benefits, how do you support yourself?
5   A   I do side things for my pops, you know what
6   I mean?  Like he needs a little help cutting his
7   grass, maybe help cutting some limbs down from a tree
8   or something, you know what I mean?
9   Q   Right.
10   A   He gives me basic work to do to give me a
11   couple dollars, you know what I mean, to maintain.
12   Q   Okay.  So your father supports you?
13   A   Yes.
14   Q   Okay.  He gives you spending money?
15   A   Well, I got to work for it.
16   Q   That was a bad question then.  The money you
17   have comes from Social Security and from your father.
18   Are there any other sources of money for you?
19   A   Stamps.  I get food stamps.
20   Q   You get food stamps.  Any other benefits you
21   receive or any other --
22   A   Medical.  I have medical benefits.
23   Q   Okay.  What's your medical benefits?
24   A   I think it's Aetna Better Health.
25   Q   Aetna Better Health?

80
1   A   Yeah.
2   Q   Do you have any other sources of income?  Do
3   you do anything to make money besides jobs for your
4   dad and besides receiving Social Security?
5   A   Once in a while like I have a side job with
6   my friend.  He does scrap.  He takes like certain
7   metals, and I guess you get a certain amount of
8   weight, they give you a certain amount of money for I
9   guess the amount of weight you have on your --
10   Q   Yeah.
11   A   Then you get paid for that, so I do that
12   sometimes.
13   Q   How often do you do that?
14   A   Probably like once a month.
15   Q   Once a month for a day?
16   A   Probably like two or three days.  But within
17   those days then when we get a certain amount of money
18   for -- like say we did it for three days.  Whatever
19   we got from those three days, we'll weigh it out and
20   then we'll get a couple dollars for that.
21   Q   How much do you usually get?  Let's say it's
22   three days of work.  What would you say you'd get for
23   that?
24   A   Probably about 40 bucks.
25   Q   40 bucks between the two of you?

81
1   A   No.  It's split.  You could get 80, so he
2   would take 40, I will get 40.
3   Q   Okay.  All right.  When was the last time
4   you filed a tax return?  Have you ever filed a tax
5   return?
6   A   Not that I can remember.  I think I have,
7   but I don't remember.  I'm not too sure.  It's been a
8   minute, you know what I mean?
9   Q   When you say it's been a minute, it's --
10   A   It's been a long time.
11   Q   It's been at least five years?
12   A   A long time.
13   Q   It had to have been at least five years?
14   A   Longer than that.
15   Q   At least ten years?
16   A   Longer than that.
17   Q   Okay.  So longer than ten years?
18   A   Yes.
19   Q   Fair enough.  You've sued Officer Patrick G.
20   Gartrell, Jr.  Can you describe Officer Gartrell to
21   me?  What does he look like?  First of all, I'm
22   assuming it's a man because it's Patrick, is that
23   correct?
24   A   It sounds like a man.
25   Q   It sounds like a man.  It does indeed.  Is

**Alonzo D. Jones**
**August 14, 2019**

82

1  he a black man?  A white man?  An Asian man?
2  Hispanic man?
3     A    I'm not sure, sir.
4     Q    Okay.  You're not sure if he's black or
5  white?
6     A    He sounds like he's Spanish.
7     Q    Sounds Spanish?
8     A    Yeah.
9     Q    And that's based on his name, sir?
10    A    Yes.
11    Q    Okay.  Could you pick him out if I showed
12 you a picture -- if I showed you eight pictures of
13 Hispanic males and one of them was Officer Gartrell,
14 could you pick him out?
15    A    Maybe.
16        MS. THOMPSON:  I object to the form of
17 the question.
18 BY MR. BOYLE:
19    Q    And the answer was maybe, sir?
20    A    Maybe.
21    Q    Okay.  When you say it sounds Spanish, do
22 you have any recollection at all of what Officer
23 Gartrell looks like or are you basing the sounds
24 Spanish on the sound of his name?
25    A    I said he sounds Spanish, that's what I

83

1  said.  He sounds Spanish.
2     Q    Okay.  Can you form a picture in your head
3  of what he looks like?
4     A    Not at this time, no, you know what I mean?
5     Q    No.  I don't know what you mean.
6     A    Not at this time, sir.
7     Q    You don't know what he looks like?
8     A    Right at this time, no, I couldn't tell you
9  what somebody looks like.  There's certain officers
10 that were there if I had seen them again, I probably
11 could verify to you.
12    Q    Okay.
13    A    I remember him being there, you know what I
14 mean, if he was in front of me or so on and so forth.
15    Q    Okay.  How is it you remember -- you
16 described the actions of several officers being
17 present.  How do you say that Officer Gartrell did
18 something as opposed to one of the other officers?
19 How are you able to say it was him and not one of the
20 others?
21    A    How would I be able to say it was him and
22 not the others?
23    Q    Yes.
24    A    What do you mean by that?
25    Q    All right.  Let's find an allegation.  Let's

84

1  go to Page 5 in the complaint, Paragraph 13, under
2  the heading Facts, so these are the sections of the
3  facts in your complaint.  Okay.  Not -- I don't want
4  any opinion on legal language.  I want just on the
5  facts.
6        It says on February 8, 2017, Officer
7  Gartrell as a member of the YCDTF along with other
8  members or agents of the YCDTF acting alone or with
9  YCDTF aggressively and erratically drove an unmarked
10 police van toward Plaintiff with great speed, and
11 then it goes on to say where you were.
12       Can you say that that was Officer Gartrell
13 driving at the time?
14    A    If that was the person driving, then that
15 would be him.  If that wasn't the person driving,
16 then it wouldn't be him.  That's all I can state to
17 you.
18    Q    I'm going to --
19    A    Because I don't know specifically who was
20 driving that car, but I know when one of them got out
21 and stated after I jumped out of the way and got away
22 from him from a distance, like we're the police, why
23 are you running.  I said well, when do the police try
24 to run a person into the wall.
25    Q    Okay.  Who was it that said we're the

85

1  police, why are you running?
2     A    It was a person that -- he jumped out the
3  passenger seat.
4     Q    Okay.  Was that Officer Gartrell?
5     A    I'm not sure.
6     Q    Okay.  What did that officer look like?
7     A    He was -- I'd say -- he looked like kind
8  of -- how would I say?  I don't want to say Spanish.
9  He looked like -- he was a white male with a
10 little -- I would say a tan to him, a little tan to
11 him, you know what I mean?
12    Q    How tall?
13    A    Probably about five-eight, five-nine.
14    Q    Can you estimate his weight or tell me what
15 his size was?
16    A    No.  I can't do all that.  I don't know.
17    Q    Thin?  Medium?  Heavy?
18    A    He was thin built.
19    Q    Thin built?
20    A    Mm-hmm.
21    Q    Okay.  Do you know what he was wearing?
22    A    Regular clothes.
23    Q    What are regular clothes?  This is regular
24 clothes to me.
25    A    A shirt and pants.

Alonzo D. Jones
August 14, 2019

86

1    Q    A shirt and pants.  Like a police shirt?
2  Was he in uniform?
3    A    Just a regular shirt and pants.
4    Q    Do you remember what color it was?
5    A    White shirt, I think it was.  White shirt.
6    Q    White shirt.  When you say regular pants,
7  jeans?  Khakis?  Black?  Blue?
8    A    Probably jeans.
9    Q    Probably jeans?
10    A    Probably jeans.
11    Q    Do you have a distinct -- do you have a
12  memory of what he was wearing or are you guessing?
13    A    I'm just going off of what -- I remember he
14  had a white shirt.  He had a white shirt on.  He was
15  chasing me.  And, like I said, when we got a
16  distance, he was like we're the police, why you
17  running.  I said well, when did the police try to run
18  you into a wall.
19         He didn't say we're the police, we're the
20  police, stop, freeze, all that, you say that stuff.
21  Not we're going to run you into the wall and break
22  your legs and then discuss the situation to you.
23    Q    Okay.  But you can't tell me whether Officer
24  Gartrell was driving the van; right?
25    A    I'm not sure whether he was driving or he

87

1  was a passenger.
2    Q    Okay.  Can you tell me whether he was the
3  passenger that got out and asked you why you were
4  running?
5    A    I just said I couldn't tell you that.
6    Q    I'm sorry.  I must have missed it.  Was
7  there anyone else in the van?
8    A    It was two of them.
9    Q    Just the two of them.  Did you see any other
10  police officers out there in the alley?
11    A    No, sir.  After that, police officers came
12  to the area.
13    Q    Okay.
14    A    But they were the only ones that jumped out
15  that van and, quote, unquote -- well, he was the only
16  one that jumped out the van at the time.  The other
17  one backed up, you know what I mean, they went
18  through the procedure.  Like I said, he pat me down,
19  and I don't have anything, and I asked him what is
20  this all about.
21    Q    Okay.  What did the driver of the van look
22  like?  There was only two.  The passenger was the tan
23  white male five-eight, five-nine.  What did the other
24  one look like?
25    A    It was a white male.

88

1    Q    White male?
2    A    Yeah.
3    Q    How tall?
4    A    I can't -- I don't remember, sir.
5    Q    Was he taller or shorter than the first one?
6    A    I don't remember.  I don't remember.
7    Q    What was he wearing?
8    A    I don't remember what he was wearing.  One
9  of them got out, and, like I said, he got out and
10  chased me a little bit, and he said we're the police,
11  why are you running, like I said.  And I'm like well,
12  when do the police try to run you into the wall and
13  break your legs.
14    Q    Okay.  Neither one of those officers was a
15  Spanish officer?
16    A    They didn't look Spanish to me.  They just
17  had -- one of them had like a little tan to him, and
18  the other one was a lot lighter.
19    Q    Okay.  The other officers that arrived on
20  scene, were they all in uniform?
21    A    Most of them.
22    Q    Most of them?
23    A    Yeah.
24    Q    Did you have any interaction with any
25  officer?  Besides the two from the van, okay, besides

89

1  those two, did you have any interaction out there on
2  the street with any officers in plain clothes?
3    A    On the street?  What do you mean on the
4  street?
5    Q    Where they stopped you --
6    A    Oh, where they stopped me at?
7    Q    Let me give you the whole thing.  You said
8  you're walking in the alley, and the van comes
9  speeding towards you, and you ran for a distance, and
10  the passenger of the van gets out and stops you.  And
11  then the driver of the van gets out and is dealing
12  with you; right?
13    A    I said the passenger got out, and he chased
14  me a little bit and said why are you running, we're
15  the police.
16    Q    Did you stop at that point?
17    A    No.  I slowed down and said well, hold on,
18  when did the police start trying to run you into a
19  wall and break your legs.
20    Q    Okay.  You eventually stopped or you --
21    A    Yeah, I stopped.  I just stopped running.  I
22  was talking to him.
23    Q    Let me get it all out.  Did you stop or did
24  he catch you?
25    A    No.  I stopped, yeah.

Alonzo D. Jones
August 14, 2019

90

1   Q    Okay. How far from when you first started
2  running until when you stopped?
3     A    About 20 yards.
4     Q    About 20 yards, okay. And the plain clothes
5  officer who was driving the van, does he get out of
6  the van at some point?
7     A    Probably eventually, you know what I mean,
8  but I don't remember, you know what I mean, the
9  whole, you know what I mean, the whole situation, the
10  whole day. I know that other cops had come because
11  they took me to the ground, and I got down.
12         Other police officers were coming. One was
13  coming from Philly into the parking lot. I guess it
14  was like you come in from Philly or you can come
15  through the back entrance.
16     Q    When you say Philly, you mean Philadelphia
17  Street?
18     A    Philadelphia Street. Sorry about that.
19     Q    I'm not from the area.
20     A    All right. Philadelphia Street.
21     Q    Okay.
22     A    You can come in from Philadelphia Street.
23  It was like an entrance. You can get in from there
24  or you can get in from the alleyway.
25     Q    Okay.

91

1     A    You know what I mean?
2     Q    I do know what you mean.
3     A    All right. So there was officers coming
4  from that way, too.
5     Q    All right. From that point until you're put
6  in a car and taken someplace else, did you have any
7  dealings with any plain clothes police officers,
8  officers who were not in uniform?
9         MS. THOMPSON: I'm going to object to
10  the form of the question. Go ahead.
11  BY MR. BOYLE:
12     Q    Do you understand what I'm asking?
13     A    Yeah. You said did I have any contact with
14  any other officers that didn't have any police
15  clothes on basically. Just regular police clothes
16  on. You're talking about regular clothes?
17     Q    Right.
18     A    All right. Those two were the only two that
19  I seen at the time that got out, and, like I said,
20  like one of them got out and chased me. The other
21  one backed up, you know what I mean, following his
22  procedure, you know what I mean?
23         Once the guy told me why you running from
24  the police, well, when did the police try to run you
25  into the wall and break your legs. All right. Well,

92

1  you were supposed to be making a sale to a CI. Well,
2  hold on, I'm walking down the alley by myself, sir.
3  What are you seeing that I'm not seeing is what I
4  asked him.
5     Q    I appreciate all the detail. I'm going to
6  ask you, though, to listen to the question that I ask
7  just so that we can get out of here sometime today.
8     A    I apologize.
9     Q    That's okay. You're being very helpful, and
10  I appreciate that. I really do. But what I'm asking
11  you is if you remember dealing with any other plain
12  clothes officers. I believe you said no at the start
13  of your answer.
14     A    Yeah. I said no.
15     Q    Okay. Which of the officers handcuffed you?
16     A    The one I told you that got out and quote,
17  unquote, chased me a little bit, you know what I
18  mean? I stopped for him because he said he was an
19  officer.
20     Q    Okay.
21     A    And then I told you I made a statement to
22  him well, when did the police try to run you into a
23  wall and break your legs.
24     Q    Okay.
25     A    You know what I mean? They usually get out

93

1  and say we're the police, freeze or something like
2  that, you know what I mean, and people supposed to
3  stop. Or if they run, then you know why they're
4  running.
5     Q    Okay. I'm going to just say this so
6  hopefully we can keep moving along here. The
7  question was which one of them handcuffed you?
8     A    The guy that got out and chased me.
9     Q    That's what I need to know.
10     A    Yes.
11     Q    Okay. So the guy that got out and chased
12  you is the one that handcuffed you. Were you injured
13  as a result of being handcuffed?
14     A    He just like pushed my head down a little
15  bit. I got like a little — just like a little
16  abrasion on my inside, an abrasion to my upper lip.
17  He ain't beat me up, you know what I mean, but he
18  rough handled me a little bit, you know what I mean?
19  Like get down, all right, put the handcuffs on you.
20  They searched me, you know what I mean? And I ain't
21  have anything and boom.
22     Q    You've been — you were arrested previously
23  like four years before that I understand?
24     A    Four years before that?
25     Q    I'm going off my notes. So if I have that

**Alonzo D. Jones**
**August 14, 2019**

94

1  wrong, you were arrested before, is that fair to say?
2      A    For what do you mean?
3      Q    You got arrested for narcotics in the past
4  before this; right?
5      A    2004.
6      Q    That's where the four came from. Not four
7  years, 2004 you got arrested. Were you handcuffed
8  then?
9      A    Yes, sir.
10      Q    Okay. Were you taken down to the ground or
11  were you told to get on the ground then?
12      A    I was sitting down with handcuffs on
13  basically. I was already in custody basically.
14      Q    You were in custody when you got arrested
15  for narcotics?
16      A    No. They put handcuffs on me. Sat me down
17  on a chair, and I'm sitting there waiting. They took
18  me out, put me in a car, and took me out to the
19  police station. Fingerprinted me. Told me what
20  their case was, so on and so forth. You are being
21  charged with possession dah, dah, dah, something like
22  that, and then boom.
23      Q    Okay. On this occasion were you
24  photographed? The occasion in our lawsuit.
25      A    Pictures taken of me?

95

1      Q    Yes.
2      A    Yeah. I'm pretty sure.
3      Q    Did they take your fingerprints?
4      A    Yes.
5      Q    Okay. Did you receive any treatment for the
6  abrasion on your lip you described?
7      A    In this case here?
8      Q    Yes.
9      A    I just went to the hospital, and then they
10  sent me to York County Prison. No.
11      Q    Okay. Did you tell anybody at York County
12  Prison that you needed treatment for the abrasion on
13  your lip?
14      A    No. I just drunk water actually.
15      Q    Okay. Did you need stitches?
16      A    No. It wasn't that bad.
17      Q    Okay.
18      A    Like it swelled up a little bit.
19      Q    Okay. How long before the swelling went
20  down?
21      A    By the night.
22      Q    By the night, okay. No scars as a result of
23  it?
24      A    There was a little. It's gone now. Like a
25  little cut inside, but it's gone.

96

1      Q    Okay.
2      A    About a couple days.
3      Q    I'm trying to find out the extent of any
4  injury you received as a result of the actions of the
5  police. Okay? Have you described -- now, strike
6  that. Let's keep going.
7          Look at Paragraph 15. I'll read it.
8  Officer Gartrell acting alone or with YCDTF then
9  aggressively and with more force than necessary to
10  gain Plaintiff's compliance grabbed Plaintiff,
11  handcuffed him to where it affected Plaintiff's
12  circulation and accused Plaintiff saying that he was
13  about to sell drugs.
14          Is it safe to say or is it fair to say that
15  you don't know whether that was Officer Gartrell or
16  some other officer?
17      A    They said it was Officer Gartrell. Then
18  that's the one I stated that got out and had a little
19  tan to him. He had like a tan to him like I said.
20      Q    When you say they, you're looking at your
21  complaint?
22      A    Yes.
23      Q    They being your lawyers who wrote this
24  complaint on your behalf. They say Officer Gartrell
25  acting alone or with YCDTF. I'm asking you do you

97

1  know whether it was Officer Gartrell or somebody else
2  or some other police officer or don't you know?
3      A    Beings I'm not too sure, you know what I
4  mean, I couldn't say.
5      Q    You couldn't say.
6      A    I'm not too sure.
7      Q    Okay. Would that be the same for everything
8  that's described in your complaint that refers to
9  Officer Gartrell? You don't know whether it was
10  Officer Gartrell or some other officer?
11          MS. THOMPSON: Objection to the form
12  of the question. Go ahead.
13      A    Well, these are the officers that were
14  stated that did procedures to me. I don't know.
15  When I say I don't know them, I don't know them in
16  general as like I know my brothers, I know my
17  sisters, I know my cousins. These are people that I
18  actually know. Because I seen you one time doesn't
19  mean I know you.
20  BY MR. BOYLE:
21      Q    Okay. But you didn't sue your brothers or
22  other people you know.
23      A    Yeah. That's people I know you. I know
24  you. Like I said, I know you. I said I know you, I
25  know who you are.

**Alonzo D. Jones**
**August 14, 2019**

98

1   Q   Okay.
2   A   And if I seen you once, that's a difference.
3   Q   Are all your allegations, all the things
4   that are said in this lawsuit, based on something you
5   read in paperwork or were told by somebody else about
6   Officer Gartrell?
7       MS. THOMPSON: Objection to the form
8   of the question. Go ahead.
9   A   No, sir.
10  BY MR. BOYLE:
11  Q   Okay. Are they based on your own
12  independent recollection? Are they based on your
13  memory of what happened specifically as regarding
14  Officer Gartrell?
15  A   Yes, sir.
16  Q   Okay. Please tell me in your own words
17  everything that only Officer Gartrell did. I don't
18  want to know about Chief Bentzel, District Attorney
19  Sunday, or any other member of the Task Force. If
20  you would please tell me what Officer Gartrell and
21  only Officer Gartrell did in regards to your lawsuit.
22  A   Okay. Well, Officer Gartrell, as I stated,
23  jumped out the van and chased me. He pulled me down
24  to the ground, and I said -- I was like I stopped
25  running, you know what I mean? Pulled me down to the

99

1   ground. Put the handcuffs on me, you know what I
2   mean? Searched my pockets and everything.
3       He takes me, walks me down the hill towards
4   the alley we was at, and then a police car pulls up,
5   and he puts me in the back of that police car. So
6   I'm sitting in the back of that police car waiting,
7   and eventually they take me down on Philadelphia
8   Street -- excuse me -- to the building, and I was
9   searched two more times.
10  Q   Who searched you those two more times?
11  A   These were other police officers that were
12  already there.
13  Q   Okay. Not Officer Gartrell, is that
14  accurate? Is that right?
15  A   Well, he's not the one that -- basically he
16  wanted me searched right then and there. Another
17  officer that was there seen me moving, and he said I
18  think you're hiding something in your buttocks.
19  Q   Okay. So it was an officer other than
20  Officer Gartrell who said I think you're hiding
21  something in your buttocks?
22  A   Basically.
23  Q   What do you mean basically?
24  A   Yes, yes.
25  Q   Yes, okay. All right. We stopped there for

100

1   a second for a follow-up question, but why don't you
2   go on and tell me specifically regarding Officer
3   Gartrell what else did Officer Gartrell do.
4   A   Besides roughing me up and asking me
5   questions, put me in the car. Like I said, he took
6   me out to the car and put me in the seat. And I sat
7   there, and I waited. And like I said, they took me
8   down to the station on Philly.
9   Q   Who? Officer Gartrell drove?
10  A   No. He put me in the back of a police car.
11  Q   Okay. I'm asking you about Officer
12  Gartrell. We can talk about the officers later, but
13  right now I want to know specifically what Officer
14  Gartrell did. You said he's the one who was on the
15  passenger side, the tan five foot eight, five foot
16  nine thin officer who jumped out and handcuffed you
17  and put you in the car, and they took you down to
18  where the other officers said you had something in
19  your buttocks; right?
20  A   Yeah. He said well, you're moving around.
21  We think you got something hid in your buttocks.
22  Q   Okay. Have you told me everything up to
23  that point that Officer Gartrell did?
24  A   Besides rough me up when I was there.
25  Q   Okay. What do you mean by rough me up?

101

1   A   Like push me down. Use a little force. I
2   mean I gave myself up. He didn't have to use force.
3   Q   What kind of force did he use that he didn't
4   have to use?
5   A   Just pushed me down to the ground and took
6   my arm, you know what I mean, you know what I mean?
7   Like I say, he pushed me down with a little force.
8   That's where I got a little abrasion on my lip.
9   Q   Okay.
10  A   Yeah.
11  Q   Did you receive any other injuries besides
12  the abrasion on your lip from him roughing you up?
13  A   Just a little -- I mean just pulling my arms
14  back and handcuffing me, you know what I mean?
15  That's about it, yeah. Just a little roughing up
16  while handcuffing me.
17  Q   Okay. He could have done it a little nicer,
18  is that fair to say?
19      MS. THOMPSON: Objection to the form
20  of the question. Go ahead.
21  BY MR. BOYLE:
22  Q   Do you understand the question?
23  A   Yes. I understand. I mean if I give myself
24  up, you don't have to use force. That's what I'm
25  saying.

**Alonzo D. Jones**
**August 14, 2019**

102

1   Q    Okay.
2   A    I stopped running because he say he was the
3   police. I didn't know what the situation was.
4   Q    Do you know if Officer Gartrell ever
5   arrested you before?
6   A    Not that I know of.
7   Q    Okay. And you said he asked you questions.
8   Was that out when he put the handcuffs on you he
9   asked you questions or --
10  A    Do you have any drugs, contraband, dah, dah,
11  dah. No, sir, I don't have anything on me. That's
12  why I don't understand what this situation was about.
13  Q    Okay.
14  A    I explained it.
15  Q    Then they put you in a car and take you to
16  another spot where two other officers search you two
17  times?
18  A    No. It was one officer. He searched me
19  twice. He said I think you're hiding something in
20  your buttocks.
21  Q    Okay. What's the next thing that Officer
22  Gartrell -- have you told me everything Officer
23  Gartrell did up to that point?
24  A    Officer Gartrell, him and the other officer
25  I guess that was in car, they took me out to the York

103

1   Hospital.
2   Q    Okay. We'll get there.
3   A    Okay.
4   Q    We're at the point where you've been
5   searched two times out on the street.
6   A    Mm-hmm.
7   Q    What's the next thing that Officer Gartrell
8   does?
9   A    Well, he waits until they verify that they
10  want to take me to York Hospital.
11  Q    That all happened on the street?
12  A    Oh, no. This was when they took me, I told
13  you, to the police station.
14  Q    Okay.
15  A    The first time.
16  Q    All right. The other --
17  A    Took me --
18  Q    Let me ask the question. The other officers
19  took you to the police station; right?
20  A    Yeah, the officer he put me in the car took
21  me to the police station.
22  Q    Right. When is the next time you see
23  Officer Gartrell?
24  A    He came in there. He started questioning me
25  at the police station.

104

1   Q    At the police station?
2   A    Yes.
3   Q    All right. And that's when he asked you
4   about selling drugs?
5   A    Mr. Jones, they're saying that you were
6   supposed to meet a such and such and such and such.
7   I'm like sir, I don't understand because I wasn't
8   meeting with anybody there. There was nobody back
9   there, but me. And where is this quote, unquote,
10  person that I'm supposed to be meeting. That's what
11  I was trying to figure out.
12  Q    Okay. And that was all Officer Gartrell who
13  did all that; right?
14  A    He was questioning me, asking me questions.
15  Q    Okay. What's the next thing that Officer
16  Gartrell did? Good, bad, or indifferent, what's the
17  next thing you remember that officer, Officer
18  Gartrell, doing?
19  A    Asking me questions and, you know what I
20  mean, is this you. I mean yes. All right. We got
21  to fill your name. Sign your name here. I had to
22  sign my name on certain pieces of paper that verify
23  this was me and why they arrested me and so on and so
24  forth, you know what I mean? Do I pled guilty or not
25  guilty. I'm not guilty because I didn't do anything,

105

1   so you know what I mean?
2       I was supposed to be just talking to him.
3   Then when he left, it was another officer that was in
4   there, and he seen me moving back like moving around.
5   He said it looks like you have something -- you don't
6   want me to talk about that, but he was -- after that
7   situation, he went out to the hospital with me.
8   Q    Okay. So you started telling me about the
9   other officer came in and said he saw you moving
10  around?
11  A    Yeah. He said you're moving too much, I
12  think you got something in your buttocks. And I'm
13  like why you say that. He said because you're moving
14  too much.
15  Q    Was that the same officer who said that out
16  on the street or was it a different officer?
17  A    No. That was a different officer in the
18  building on Philadelphia Street.
19  Q    In the building on Philadelphia Street. And
20  that was not Officer Gartrell. Officer Gartrell had
21  left the room at that point?
22  A    Yes. He's the one that I said the two that
23  were in the van took me to the -- what's the name?
24  To the York Hospital.
25  Q    Okay. Did you already describe everything

**Alonzo D. Jones**
**August 14, 2019**

106

1  that happened at the hospital?
2     A    Yes, basically.
3     Q    Okay.  And nobody found drugs on you?
4     A    Nobody.
5     Q    Okay.  In Paragraph 16 it says you denied
6  involvement.  It says Plaintiff denied involvement in
7  drug sales and that he had drugs on his person.  You
8  tell them -- what does it mean deny drug sales?
9  Denied drug sales on this occasion or denied ever
10  selling drugs?
11          MS. THOMPSON:  Objection to the form
12  of the question.
13  BY MR. BOYLE:
14     Q    Did you understand the question?
15     A    I understood what you were saying.
16          MS. THOMPSON:  I'm not sure just
17  understanding the question is the objection, but...
18          MR. BOYLE:  It was to the form of the
19  question.  So it's whether the witness understands
20  the question because he's the one under oath.
21          MS. THOMPSON:  What paragraph are you
22  referencing again?
23          MR. BOYLE:  Paragraph 16.
24          MS. THOMPSON:  Okay.
25          MR. BOYLE:  You made your objection.

107

1  BY MR. BOYLE:
2     Q    Did you understand the question, sir?
3     A    Say that again.  I'm sorry.
4     Q    Sure.  It says Plaintiff denied involved in
5  drug sales and that he had drugs on his person.  Did
6  you deny selling drugs on this occasion that's
7  described in the complaint or did you deny ever
8  selling drugs?
9     A    Well, I told them specifically that I wasn't
10  selling drugs in some kind of pictures they were
11  trying to show me.
12     Q    Okay.
13     A    Yeah.
14     Q    You described those pictures at your
15  first -- what I'm calling your first deposition when
16  we met the first time.  Were they the same pictures
17  that you saw at court that they showed you here at
18  the police station?
19     A    Actually, they didn't bring them to court.
20  We never had a chance to get in court because they
21  kept -- how you saying -- prolonging the situation.
22     Q    Okay.  So you never saw those pictures at
23  court with the District Attorney?
24     A    No.  I seen them once, and that was like
25  when we were sitting in the -- like I said, my public

108

1  defender, it was a DA, and it was a guy that was
2  there with her, and like they said -- they were
3  trying to show me pictures saying this is you,
4  Mr. Jones, selling drugs to a certain person.  I'm
5  like well, hold on.  There's nobody over here where
6  you're stating at.
7          They said no, Mr. Jones, this is you right
8  here selling drugs to a person.  I said well, hold
9  on, if I'm beside this car selling drugs, why would
10  my hat be outside the car.
11     Q    Okay.  It was Officer Gartrell who took you
12  to the hospital?
13     A    Yeah, Gartrell and there was another officer
14  that was with him.  Those were the ones that were in
15  van.
16     Q    The same two that were in the van took you
17  to the hospital; right?
18     A    Those are the same two that were in the van.
19     Q    Okay.  And they're the ones that were there
20  when you told the doctor that you can't have a CAT
21  scan because of the plate in your head, is that
22  correct?
23     A    Yes.  I'm sure.
24     Q    Yes, I'm sure, is that what you said?
25     A    Yes.

109

1     Q    Okay.  I want you to think back to the
2  instant before the van comes towards you.
3     A    What you mean?
4     Q    I want you to picture in your head right
5  before the police came in that van.  Was there
6  anybody else out there but you?
7     A    Walking through the alleyway?  (Shaking
8  head.)
9     Q    That's a no?  Nobody in the alleyway?
10     A    Nuh-uh.
11     Q    Is that a no, sir?
12     A    No, sir.  There was nobody in the alleyway.
13     Q    Okay.  Who was the last person you had seen
14  before that van came up and where did you see them?
15     A    I seen my girlfriend.
16     Q    Okay.  Did you see anybody else out on the
17  street when you left your girlfriend's?
18     A    No.
19     Q    So from the time you left your girlfriend
20  until the time the police came towards you with that
21  van, you hadn't seen another human being, is that
22  fair?
23     A    I seen cars, but I didn't see no human being
24  coming towards me walking towards me or anything.
25  Standing outside or anything, no.

**Alonzo D. Jones**
**August 14, 2019**

---

110

1    Q    You saw cars, and obviously they weren't
2  driving themselves.
3    A    Mm-hmm.
4    Q    Leave them out of it.  Without the cars,
5  anybody walking either toward you or away from you
6  from the time you left your girlfriend's house until
7  that van came toward you?
8    A    No.  The only person I seen was my
9  girlfriend, like I said.  My girlfriend, that's the
10  last person I saw.
11    Q    All right.  In Paragraph 26 you refer to a
12  cavity search at the prison.  Was Officer Gartrell
13  present for the cavity search at the prison?
14    A    No.  That was another search that I had to
15  do because I was incarcerated for something I didn't
16  do.
17    Q    All right.  Did you get strip searched at
18  the police station or just those two times out on the
19  street?
20    A    No.  I got stripped once on the street,
21  twice at the police station.
22    Q    Once on the street, twice at the police
23  station.  But once on the street, you said that was
24  the officers who came up in the car; correct?
25    A    In the van.

---

111

1    Q    All right.  The one time you got strip
2  searched on the street was the officer --
3    A    No.  I didn't say I got strip searched on
4  the street.  I said I got searched on the street.  I
5  ain't say strip searched.
6    Q    Thank you.  When you say searched on the
7  street, you got patted down?
8    A    Patted down.
9    Q    Okay.  Then you go back to the building on
10  Philadelphia Street?
11    A    Yes.
12    Q    Okay.  And that's where you got strip
13  searched two times?
14    A    Yes.
15    Q    And that was by the officer who said he
16  thinks you have something in your buttocks?
17    A    Yes.
18    Q    Okay.  Where was Officer Gartrell when those
19  two strip searches were taking place?
20    A    He wasn't right there in the room at the
21  time, but he came down after the guy had did it and
22  said I think he has it in his buttocks and you all
23  need to take him to York Hospital.
24    Q    Okay.  That's when he, Officer Gartrell, and
25  another officer took you to York Hospital?

---

112

1    A    Yes.
2    MR. BOYLE:  I'm going to get copies of
3  these documents, and I'm assuming they can do it
4  here, and then I believe I'm finished.  Do you have
5  anything else, Sean?
6    MR. SUMMERS:  Let me think about it.
7  I didn't think you would be done that quick.
8    (Recess taken from 12:16 p.m. until
9  12:22 p.m.)
10    (Jones Deposition Exhibit 2 was marked
11  for identification.)
12    MR. SUMMERS:  I don't have any further
13  questions, Mr. Jones.
14    MR. BOYLE:  I'm done.
15    (The deposition was concluded at 12:22
16  p.m.)
17
18
19
20
21
22
23
24
25

---

113

1  COMMONWEALTH OF PENNSYLVANIA    )
                                   )  SS.
2  COUNTY OF YORK                  )
3
      I, Tracy L. Lloyd, a Registered Professional
4  Reporter and Notary Public in and for the
   Commonwealth of Pennsylvania and County of York, do
5  hereby certify that the foregoing testimony was taken
   before me at the time and place hereinbefore set
6  forth, and that it is the testimony of:
7
                    ALONZO JONES
8
9      I further certify that said witness was by me
   duly sworn to testify the whole and complete truth in
10  said cause; that the testimony then given was
   reported by me stenographically, and subsequently
11  transcribed under my direction and supervision; and
   that the foregoing is a full, true and correct
12  transcript of my original shorthand notes.
13      I further certify that I am not counsel for
   nor related to any of the parties to the foregoing
14  cause, nor employed by them or their attorneys, and
   am not interested in the subject matter or outcome
15  thereof.
16      Dated at York, Pennsylvania, this 28th day of
   August, 2019.
17
18
19         Tracy L. Lloyd
           Tracy L. Lloyd, Notary Public
20         Registered Professional Reporter
21
   (The foregoing certification does not apply to any
22  reproduction of the same by any means unless under
   the direct control and/or supervision of the
23  certifying reporter.)
24  My Commission expires:
   April 21, 2023
25

---